**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RALPH SCHOENMAN,

    Plaintiff,

     v.

FEDERAL BUREAU OF INVESTIGATION,
*et al.*,

    Defendants.

Civil Action No. 04-2202 (CKK)

**MEMORANDUM OPINION**
(March 19, 2009)

Plaintiff, Ralph Schoenman, a political activist and author, filed the above-captioned

action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy

Act of 1974 ("Privacy Act" or "PA"), 5 U.S.C. § 552a, seeking access to an array of records

pertaining to himself, Lord Bertrand Russell, and six organizations, from a total of ten different

named agencies and a number of unnamed agencies to which the named agencies might refer

documents for a determination as to releasability (identified as "John Doe Agencies 1-10" in

Plaintiff's Complaint).  Plaintiff's Complaint named as Defendants: the Federal Bureau of

Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the Defense Intelligence Agency

("DIA"), the Department of the Air Force ("Air Force"), the Department of Justice ("DOJ"), the

Department of the Army ("Army"), the Department of the Navy ("Navy"), the Department of

State ("State Department"), the National Archives and Records Administration "NARA"), the

National Security Agency ("NSA"), and John Doe Agencies 1-10.  Compl. at 1 & ¶ 13.

In a Memorandum Opinion and Order dated March 31, 2006, the Court dismissed certain

portions of Plaintiff's Complaint against Defendants CIA, NARA, NSA, Air Force, Army, and Navy because Plaintiff either could not show that the agencies had received his FOIA/PA requests or could not show that he had exhausted his administrative remedies as to the agencies. *See generally Schoenman v. FBI*, Civ. A. No. 04-2202, 2006 WL 1126813 (D.D.C. Mar. 31, 2006).  By Memorandum Opinion and Order dated June 5, 2006, the Court dismissed without prejudice certain portions of Plaintiff's Complaint against the FBI and the State Department.  *See generally Schoenman v. FBI*, Civ. A. No. 04-2202, 2006 WL 1582253 (D.D.C. Jun. 5, 2006) (CKK).  The Defendants with remaining obligations to process documents in response to Plaintiff's request did so.  Those Defendants, along with the agencies to whom they have referred documents for releasability determinations, have now begun moving for summary judgment, and Plaintiff has filed cross-motions for summary judgment.[1]  This Memorandum Opinion addresses only the Motion for Summary Judgment filed by the CIA and the Cross-Motion for Partial Summary Judgment filed by Plaintiff.

The Court has conducted a searching review of the CIA's Motion for Summary Judgment, Plaintiff's Cross-Motion for Partial Summary Judgment/Opposition, the CIA's Opposition/Reply, Plaintiff's Reply, the exhibits attached to those filings, the relevant statutes and case law, and the entire record herein.  Based upon the foregoing, the Court shall GRANT-IN-PART the CIA's [64] Motion for Summary Judgment and shall DENY-IN-PART Plaintiff's

---

[1]This Court previously granted summary judgment in favor of Defendants as to Plaintiff's claims against the DIA, the Air Force, the Army, the Navy, and the Criminal Division of the DOJ.  *See Schoenman v. FBI*, 575 F. Supp. 2d 136 (D.D.C. 2008); *Schoenman v. FBI*, 575 F. Supp. 2d 166 (D.D.C. 2008).  In addition, the Court also granted summary judgment in favor of Defendant State Department as to Plaintiff's claims against the State Department.  *See Schoenman v. FBI*, 573 F. Supp. 2d 119 (D.D.C. 2008); *Schoenman v. FBI.*, 576 F. Supp. 2d 3 (D.D.C. 2008).

[70] Cross-Motion for Partial Summary Judgment, finding in favor of Defendant CIA as to (1) the adequacy of the CIA's search, to the extent the CIA declined to task the Directorate of Intelligence and the independent entities that report to the Director of Central Intelligence to conduct a search in response to Plaintiff's FOIA/PA Request, (2) the CIA's withholding of information, and (3) the CIA's segregation of non-exempt information.  The Court cannot, however, ultimately resolve the parties' cross-motions as to the adequacy of the CIA's search of the Directorate of Operations' and the Mission Support Offices' records because the CIA has not provided a reasonably detailed and nonconclusory description of its search of those records.  In the absence of this information, the Court cannot determine whether the CIA's search of those records was adequate.  As such, the Court shall HOLD IN ABEYANCE the parties' cross-motions for summary judgment with respect to the adequacy of the CIA's search as it concerns the Directorate of Operations and the Mission Support Offices.

## I.  BACKGROUND

As an initial matter, the Court notes that the facts included herein are taken primarily from the declarations of Ralph S. DiMiao,[2] submitted in support of the CIA's Motion for

---

[2] DiMaio avers that he is the Information Review Officer for the National Clandestine Service ("NCS") of the CIA.  DiMaio Decl. ¶ 1.  He explains that the NCS is the organization within the CIA responsible for the conduct of foreign intelligence collection activities through the clandestine use of human resources.  *Id.* ¶ 3.  As the Information Review Officer for the NCS, he is responsible for both protection and review of documents originated by the NCS, or otherwise implicating NCS interests, which may be the subject of court proceedings, and also has access to all official NCS records.  *Id.*  In addition, his official responsibilities include the search for, and retrieval of, NCS records pursuant to requests for information concerning CIA operational and intelligence activities.  *Id.*  For purposes of the instant lawsuit, DiMaio has been designated the CIA Records Validation Officer and is authorized to access all CIA records relevant to this litigation and to conduct record searches within any office or component of the CIA.  *Id.* ¶ 4.  DiMaio submits his declaration to address the CIA's handling of Plaintiff's FOIA/PA Request, and to provide a *Vaughn* index of the documents from which the CIA

Summary Judgment.  *See* Decl. of Ralph S. DiMaio, Information Review Officer for the National

Clandestine Service of the CIA (hereinafter "DiMaio Decl."), submitted in support of the CIA's

Motion for Summary Judgment; *see also* Third Decl. of Ralph S. DiMaio (hereinafter "Suppl.

DiMaio Decl."), submitted in support of the CIA's Reply.  The CIA has also provided, as

required by Local Civil Rules 56.1 and 7(h), a Statement of Material Facts as to Which There is

No Genuine Issue; however, because that Statement generally summarizes DiMaio's

Declarations, the Court instead cites directly to DiMaio's Declarations.  *See generally* CIA Stmt.

Plaintiff has responded to the CIA's Statement with a responsive Statement as well as a

Statement of Material Facts Not in Dispute. *See* Pl.'s Resp. Stmt. and Pl.'s Stmt.  In his

responsive Statement, however, Plaintiff either admits the CIA's assertions or asserts that he "is

without information or knowledge sufficient to admit or deny and therefore denies," *see e.g.*,

Pl.'s Resp. Stmt. ¶¶ 2-4.  As these bare assertions are not supported by facts contradicting

DiMaio's declarations, the Court accepts DiMaio's sworn statements—which are supported by

the record of correspondence between the CIA and Plaintiff—as uncontroverted and relies upon

them herein.

   As to Plaintiff's own Statement of Material Facts, the Statement is largely inadequate for

three reasons.  First, Plaintiff's Statement relies almost exclusively upon his own declarations,

both of which were filed with Plaintiff's Cross-Motion/Opposition, as the sole support for many

of the factual assertions in his Statement that concern the activities, actions, interests, and

statements of third parties.  *See generally* Pl.'s Stmt.  Plaintiff's declarations, however, do not

provide an indication as to how Plaintiff has personal knowledge of such facts.  For example,

---

withheld information.  *Id.* ¶¶ 4, 8.

Plaintiff asserts that, "[d]uring the 1960s, the CIA conducted many illegal operations against leftwing dissidents," citing only to his own declaration for support of this statement, *id.* ¶ 13, but his Declaration in turn does not indicate how he has personal knowledge of the CIA's operations during that time period, *see generally* Decl. of Ralph Schoenman (hereinafter "Schoenman Decl."), submitted in opposition to the CIA's Motion for Summary Judgment.   Federal Rule of Civil Procedure 56(e)(1) requires that an affidavit "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."   To the extent Plaintiff's Declarations fail to comply with Rule 56(e), the declarations do not provide appropriate support for Plaintiff's Statement, and the Court shall disregard any factual assertions made without adequate support for the purposes of the parties' cross-motions for summary judgment.   Second, many of the "factual" assertions in Plaintiff's Statement are not facts at all, but rather legal arguments.  *See, e.g.,* Pl.'s Stmt. ¶ 18 ("There is no evidence that these vast disclosures [of CIA records] have damaged U.S. national security interests.").   The Court cannot accept Plaintiff's legal arguments, dressed up as facts, as uncontroverted, and notes that Plaintiff's legal arguments do not create genuine issues of material fact.   Third and finally, Plaintiff's Statement largely consists of immaterial statements that could not, even if true and adequately supported, create a material fact in dispute sufficient to defeat summary judgment.   Consequently, the Court cites primarily to DiMaio's Declarations in recounting the factual background of this case.

A. *Plaintiff's FOIA/PA Request to the CIA*

By letter dated July 24, 2001, Plaintiff, through counsel, submitted a request to the CIA pursuant to the FOIA and the PA (hereinafter "FOIA/PA Request").   *See* DiMaio Decl. ¶ 9 & Ex.

5

A.  As is relevant here, Plaintiff's FOIA/PA Request sought access to records pertaining to

himself, all "index references" and all previous FOIA requests pertaining to himself, as well as

all records used by the CIA in its searches in response to the FOIA/PA Request.[3]  *Id.*  Along with

the request, Plaintiff also submitted a Privacy Act Authorization permitting the CIA to release

records about him to his counsel.  *Id.*, Ex. A at 4.  The CIA acknowledged Plaintiff's FOIA/PA

Request in a letter dated September 18, 2001, and advised Plaintiff that his request would be

handled under both the FOIA and the PA.  *Id.* ¶ 10 & Ex. B.  In addition, the CIA advised

Plaintiff that it would search "for documents in existence as of and through the date of this

acceptance letter."  *See id.*, Ex. B.

        1.    The CIA's Records Systems

DiMaio explains in detail that all CIA records are maintained by one of four directorates

or in the independent offices and entities that report to the Director of Central Intelligence

("DCI")[4]: the Directorate of Operations ("DO"), the Directorate of Intelligence ("DI"), the

---

[3]Plaintiff's FOIA/PA Request also sought access to records pertaining to Lord Bertrand Russell, six named organizations, as well as all "index references" to the foregoing subjects, all previous FOIA requests pertaining to those subjects, and all records used by the CIA in its searches in response to Plaintiff's request.  DiMaio Decl. ¶ 9 & Ex. A.  In an order dated March 31, 2006, this Court granted the CIA's motion to dismiss Plaintiff's claim against the CIA as it related to his third-party FOIA request, holding that Plaintiff had failed to exhaust his administrative remedies with respect to his request for records pertaining to Lord Russell and the six named organizations.  *See Schoenman v. FBI*, Civ. A. No. 04-2202, 2006 WL 1126813, * 19-20 (D.D.C. Mar. 31, 2006) (CKK).  Accordingly, only the portion of Plaintiff's FOIA/PA Request seeking records pertaining to Plaintiff himself remains at issue.

[4]Prior to the enactment of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108-458, S. 2845 (2004), the Director of Central Intelligence ("DCI") served as both the head of the CIA and the head of the intelligence community.  DiMaio Decl. ¶ 4, n. 2.  As a result of the IRTPA, the Director of National Intelligence ("DNI") became the head of the intelligence community and the head of the CIA became the Director of the CIA ("DCIA").  *Id.*  Because most of the CIA's processing of Plaintiff's FOIA/PA Request occurred

Director of Science and Technology ("DS&T"), the Mission Support Offices ("MSO") and the DCI Area.  *Id.* ¶ 22.  The DO[5] is the CIA directorate that is responsible for the clandestine collection of foreign intelligence information.  *Id.* ¶ 23.  The DO's records system contains information on persons or entities that are of foreign intelligence or counterintelligence interest to the CIA and other United States Government agencies.  *Id.*  The DI is the CIA directorate that analyzes, interprets, and forecasts foreign-intelligence issues and world events of importance to the United States.  *Id.* ¶ 24.  It is responsible for the production of finished intelligence reports for dissemination to policymakers in the United States Government.  *Id.*  The DS&T is the CIA directorate that creates and applies technology to fulfill intelligence requirements.  *Id.* ¶ 25.  The DS&T also maintains records produced by the Foreign Broadcast Information Service ("FBIS"), the primary collector of foreign open source information[6] for the United States Intelligence Community.  *Id.*  The MSO[7] was the CIA's administrative and support arm and was comprised of five separate offices: Chief Information Officer, Chief Financial Officer, Global Support, Chief Human Resources Officer, and the Office of Security.  *Id.* ¶ 26.  The MSO was responsible for administrative matters and matters relating to personnel and security issues (including

---

prior to the enactment of the IRTPA, for purposes of DiMaio's Declarations, he refers to the pre-IRTPA structure and terminology.  For example, DiMaio uses the term DCI to refer to the head of the CIA.  *Id.*

[5]The DO is now called the National Clandestine Service ("NCS").  DiMaio Decl. ¶ 22, n.15.

[6]Open-source information is information that is generally available to the public, such as foreign newspapers, periodical publications, and television and radio broadcasts.  DiMaio Decl. ¶ 25.

[7]In January 2005, a new Directorate of Support was established that incorporated most of the functions of the MSO.  DiMaio Decl. ¶ 22, n. 16.

investigations of individuals having past, present, or potential relationships with CIA). *Id.*

Finally, the DCI Area includes the independent offices that report directly to the DCI, and is

distinct from the CIA's four main directorates (DO, DI, DS&T, and MSO). *Id.* ¶ 27. The DCI

Area includes the Office of Inspector General, the Office of General Counsel, the Office of

Congressional Affairs, the Office of Public Affairs, and other entities such as the Executive

Secretariat. *Id.*

2.     The CIA's General Procedures for Processing FOIA/PA Requests

In general, the CIA's Information and Privacy Coordinator, who also serves as Chief of

the Public Information Programs Division within the office of Information Management Services

("IMS"), is responsible for managing the FOIA and PA programs at the CIA. *Id.* ¶ 28. IMS is

the initial reception point in the CIA for all FOIA and PA requests. *Id.* Upon receipt of a FOIA

or PA request, IMS personnel determine which directorates of the CIA[8] reasonably might be

expected to possess records that may be responsive to the request and then forward copies of the

requester's letter to those directorates with instructions to search for any responsive documents.

*Id.* The tasked directorates then conduct searches among all directorate components, indices and

databases that reasonably might be expected to have any information responsive to the request.

*Id.* As DiMaio explains, records systems and indexing systems vary among the CIA components

(within one of the directorates described above) because the record systems must reflect and

respond to the established responsibilities and needs of those individual CIA components. *Id.* ¶

21. For example, some CIA records systems are organized to facilitate the collection of

---

[8]For purposes of DiMaio's declaration, the term "directorates" includes the DCI Area as well as the four directorates enumerated above. DiMaio Decl. ¶ 28, n.18.

intelligence, while others facilitate the analysis of intelligence information, depending on the missions of the particular CIA component.  *Id.*  Accordingly, the CIA's ability to retrieve data from a given records system depends upon the type of information stored in that system and the way the system is designed to retrieve that information.  *Id.*

After a tasked component locates documents in response to the FOIA or PA request, officers must review those documents to determine whether they, in fact, respond to the request. *Id.* ¶ 29.  DiMaio explains that, because of the nature of a particular records system, or the search tools, indices, or terms employed, a search may locate many documents that are not responsive to the request.  *Id.*  The officers therefore first identify and remove any non-responsive documents, before reviewing the remaining responsive documents to determine if any FOIA or PA exemptions apply, and whether they can reasonably segregate non-exempt information from exempt information.  *Id.* ¶ 30.  When all of the components complete their respective reviews, IMS personnel incorporate all of the recommendations regarding exemptions, segregation, and release, resolve conflicting recommendations, and ensure that the release or withholding determinations comply with the law and published CIA regulations.  *Id.* ¶ 32.  Under the direction and supervision of the CIA Information and Privacy Coordinator, a review is then conducted from a corporate perspective on behalf of the entire CIA, and additional exempt information that reflects overall CIA equities may be identified.  *Id.*  A final record copy of each document is then produced and a response is provided to the requester.  *Id.*

> 3. <u>Search for Responsive Records Specific to Plaintiff's FOIA/PA Request</u>

DiMaio explains that the CIA processed Plaintiff's FOIA/PA Request following the procedures set forth above.  *Id.* ¶ 34.  That is, the request was received by IMS, reviewed by IMS

personnel, and then tasked to those CIA directorates which IMS had determined were reasonably likely to have responsive records. *Id.* In this case, IMS tasked the DO and MSO with processing Plaintiff's FOIA/PA Request, based upon its determination that these were the two components most likely to possess responsive records, if any existed. *Id.* IMS did not task the DI, DS&T, or the DCI Area to conduct searches in response to the request. *Id.* ¶ 37. DiMaio explains that, given the analysis-based mission of the DI, IMS officers determined that the DI was not likely to have any records responsive to Plaintiff's FOIA/PA Request. *Id.* Similarly, DiMaio explains that, given the technology-based mission of the DS&T, IMS also determined that the DS&T was not likely to have any records responsive to Plaintiff's FOIA/PA Request. *Id.* Finally, given the function of the DCI Area and the offices encompassed therein, IMS decided that the DCI Area was not likely to have any responsive records either. *Id.* Accordingly, IMS tasked only the DO and the MSO to search for records responsive to Plaintiff's FOIA/PA Request, instructing those components to search for responsive records through the date of the September 18, 2001 acceptance letter. *Id.*

As to the DO, DiMaio avers that "[t]he DO made all reasonable efforts to identify and retrieve any records responsive to plaintiff's PA request." *Id.* ¶ 35. More specifically, he states that the DO searched using Plaintiff's first and last name, explaining that the DO records system automatically accounts for variations in spelling. *Id.* DiMaio further states that "[f]ive responsive documents were located" as a result of DO's search. *Id.*

As to the MSO, DiMaio avers that "[t]he MSO also made all reasonable efforts to identify and retrieve any records responsive to plaintiff's PA request." *Id.* ¶ 36. The MSO searched using Plaintiff's name and variants thereof (for example, searching for "Ralph Benedek

Schoenman,""Ralph B. Schoenman," "R Schoenman," "Schoenman," "Schonman," and "Schoeman"). *Id.* DiMaio further states that no responsive records were located as a result of the MSO's search. *Id.*

Thereafter, in a letter to Plaintiff's counsel dated November 12, 2002, the CIA informed Plaintiff that his FOIA/PA Request had been processed and that the CIA had located responsive material, but that it had determined the material must be denied in its entirety on the basis of FOIA Exemptions 1 and 3 and PA Exemptions (j)(1) and (k)(1). *Id.* ¶ 11 & Ex. C. The CIA also informed Plaintiff that he could appeal the CIA's determination within 45 days of the date of its letter. *Id.* The responsive material located by the CIA but withheld in its entirety consists of five documents, which are Documents 1-5 as described in the CIA's *Vaughn* index.[9] *See id.* at 51-53.

Plaintiff replied by letter dated November 25, 2002, indicating that he was appealing the CIA's determination. *Id.* ¶ 12 & Ex. D. The CIA acknowledged Plaintiff's appeal in a letter dated March 31, 2002 and advised Plaintiff that it had determined that the material located in response to Plaintiff's request must continue to be denied in its entirety on the basis of FOIA exemptions (b)(1) and (b)(3) and PA exemptions (j)(1) and (k)(1). *Id.* ¶ 13 & Ex. E.

    B.    *Plaintiff's FOIA/PA Requests to Other Agencies that were Referred to, or Coordinated with, the CIA*

As DiMaio explains, an agency may, in processing a FOIA or PA request, find responsive material that actually originates from another agency or that contains information that another agency may have equity in. *See id.* ¶¶ 14, 31. In that situation, the agency receiving the FOIA or PA request may "refer" the material to the other agency or may "coordinate" with the other

---

[9]The CIA has provided a *Vaughn* index, located at pages 51 through 57 of DiMaio's Declaration, which describes all responsive materials withheld. *See* DiMaio Decl. at 51-57.

agency in processing the request.  *See id.*  More specifically, a "referral" occurs when, in the course of reviewing documents responsive to a FOIA or PA request, an agency finds a document that was originated by a second agency.  *See id.* ¶ 14,  n. 5   When that occurs, the agency receiving the FOIA or PA request forwards, or "refers," the document(s) at issue to the second agency, which then becomes responsible for directly responding to the requester as to those documents.  *Id.*  "Coordination" occurs when an agency reviewing documents responsive to a FOIA or PA request finds a document that, although it originates from that agency, contains information that another agency is believed to have equity in.  *See id.* ¶ 15, n. 9.  In that situation, the agency receiving the request consults, or "coordinates," with the second agency to ensure that the second agency's equities are properly protected.  *Id.*  The agency receiving the request, however, remains responsible for directly responding to the requester after coordinating with the second agency.  *Id.*  As concerns Plaintiff, the CIA received referrals from both the State Department and the DIA and also received a request for coordination from the Department of State, as explained in detail below.

      1.    <u>Department of State Referrals</u>

By letter dated April 26, 2005, the Department of State referred five documents to the CIA, including three Foreign Broadcast Information Service ("FBIS") transcripts,[10] for review and direct response to Plaintiff.  *Id.* ¶ 14 & n. 7.  By letter dated June 30, 2005, the CIA informed Plaintiff of the Department of State referrals and advised Plaintiff that the CIA had determined that: (1) the three FBIS transcripts could be released in full; (2) one additional document could be

---

[10]DiMaio explains that the FBIS received and transcribed various foreign media broadcasts and publications.  DiMaio Decl. ¶ 14, n. 6.  The FBIS no longer exists and has since been replaced by the Director of National Intelligence Open Source Center.  *Id.*

released in part, withholding information under FOIA Exemption 3 and PA Exemption (j)(1);

and that (3) another document was withheld in its entirety pursuant to FOIA Exemptions 1 and 3,

as well as PA Exemptions (j)(1) and (k)(1).  *Id.* ¶ 14 & Ex. F.  The two responsive documents

referred to the CIA by the Department of State and which were withheld in part or in whole are

described as Documents 6 and 7 in the CIA's *Vaughn* index respectively.  *See id.* at 53-54.

Thereafter, by letter dated May 28, 2008, the CIA advised Plaintiff that, during the course

of the instant litigation, it had re-reviewed all of the documents that had been withheld either in

their entirety or in part and had determined that the latter document (Document 7) referenced

directly above, which had previously been withheld in full, could now be released in part to

Plaintiff.  *Id*. ¶¶ 14, n. 8, 18, & Ex. J.

## 2.   Defense Intelligence Agency Referrals

By letter dated June 30, 2005, the DIA referred one CIA document and 105 FBIS

transcripts to the CIA for its review and direct response.  *Id.* ¶ 16.  On June 19, 2006, the CIA

informed Plaintiff that it was withholding in its entirety the CIA document referred by the DIA,

based upon FOIA Exemptions 1 and 3.  *Id.*  This document is described as Document 11 in the

CIA's *Vaughn* index.  *See id.* at 56.  In addition, the CIA also released to Plaintiff two of the

FBIS transcripts in their entirety, but released the remaining 102 FBIS transcripts[11] in part,

withholding certain under FOIA Exemption 3.  *Id.*  The 102 FBIS transcripts that were referred

by the DIA and that were withheld in part are described as Documents 12-114 in the CIA's

---

[11]One of the 105 FBIS transcripts referred by the DIA was a duplicate, and the CIA
therefore released only one copy to Plaintiff.  *See* DiMaio Decl. ¶ 16, n. 11.  Accordingly, the
released FBIS transcripts total only 104, rather than 105.  *See id.*  In addition, the Court notes that
these documents were requested and processed solely under the FOIA, and not under the PA as
well.  *See id.*, Ex. H.

*Vaughn* index respectively.  *See id.* at 56-57.

Thereafter, the DIA referred one additional FBIS transcript to the CIA for review and direct response to Plaintiff.  *See id.* ¶ 17.  By letter dated January 31, 2007, the CIA released this FBIS transcript in part, withholding information under FOIA Exemption 3.  *See id.* ¶ 17 & Ex. I. This FBIS transcript is described as Document 115 in the CIA's *Vaughn* index.  *See id.* at 57.

3.   Department of State Coordination

By letter dated April 26, 2005, the Department of State also requested CIA coordination for four additional documents.  *Id.* ¶ 15.  As explained to Plaintiff in a letter dated June 30, 2005, the CIA determined that certain information needed to be redacted from these documents pursuant to FOIA Exemptions 1 and 3, and PA Exemptions (k)(1) and (j)(1).  *Id.* ¶ 15 & Ex. G. Accordingly, Department of State released these four documents in part, withholding certain information on behalf of the CIA.  *See id.*

Three of these Department of State documents were selected by Plaintiff to be included in the Department of State's *Vaughn* index provided as part of the Department of State's motion for summary judgment in this case.  *See Schoenman v. FBI*, 573 F. Supp. 2d 119, 141 (D.D.C. 2008). As the Court explained in its decision granting in part Defendant Department of State's motion for summary judgment, to the extent information was withheld from these three documents (Documents P107, P244, and P334) on behalf of the CIA, the parties agreed that the CIA (rather than the Department of State) would address that material in its motion for summary judgment. *Id.*  Accordingly, the CIA has, as agreed, included these three documents in its current motion, and such documents are described as Documents 8, 9, and 10 respectively in the CIA's *Vaughn* index.  *See* DiMaio Decl. at 55-56.  The Court notes that these documents are included in the

14

instant cross-motions only to the extent the Department of State withheld information on behalf

of the CIA.  To the extent the Department of State may have otherwise withheld from Plaintiff,

such information was addressed by the Department of State in its motion.

      *C.     Procedural History*

      On December 20, 2004, Plaintiff filed his complaint in the instant case, and the present

litigation ensued.  As is relevant to the instant cross-motions, the Court, as discussed above,

granted the CIA's motion to dismiss Plaintiff's claim against the CIA as it related to his third-

party FOIA request, holding that Plaintiff had failed to exhaust his administrative remedies with

respect to his request for records pertaining to Lord Russell and the six named organizations.  *See*

*Schoenman v. FBI*, Civ. A. No. 04-2202, 2006 WL 1126813, * 19-20 (D.D.C. Mar. 31, 2006)

(CKK).  Accordingly, only the portion of Plaintiff's FOIA/PA Request that sought records

pertaining to Plaintiff himself is at issue in the instant Memorandum Opinion.

      The CIA subsequently filed its Motion for Summary Judgment, *see* Docket Nos. [64] &

[65], and Plaintiff thereafter filed his Cross-Motion/Opposition, *see* Docket Nos. [70] & [72].

The CIA filed its Opposition/Reply, *see* Docket Nos. [75] & [76], and Plaintiff filed his Reply,

*see* Docket Nos. [82] & [83].  Accordingly, the parties' cross-motions for summary judgment are

now ripe for review.

## II.  LEGAL STANDARDS

      *A.     FOIA*

      In reviewing a motion for summary judgment under FOIA, the Court must conduct a *de*

*novo* review of the record.  *See* 5 U.S.C. § 552(a)(4)(B).  In the FOIA context, "*de novo* review

requires the Court to 'ascertain whether the agency has sustained its burden of demonstrating that

the documents requested . . . are exempt from disclosure under [] FOIA.'" *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. DOJ*, 140 F.3d 1077, 1080 (D.C. Cir. 1998)).  Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-52 (1986).

Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency seeking summary judgment proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp 32, 35 (D.D.C. 1996) (citing *Weisberg v. DOJ*, 705 F.2d 1344, 1350 (D.C. Cir. 1983) (hereinafter "*Weisberg I*")).  In opposing a motion for summary judgment, a party must offer more than conclusory statements. *See Broaddrick v. Exec. Off. of President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham v. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).  Indeed, a plaintiff pursuing an action under FOIA must establish that the agency has improperly claimed an exemption as a matter of law or that the agency has failed to segregate and disclose all non-exempt information in the requested documents. *See Perry-Torres v. Dep't of State*, 404 F. Supp. 2d 140, 142 (D.D.C. 2005).

Congress enacted FOIA for the purpose of introducing transparency to government activities. *See Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984).  Congress remained sensitive, however, to the need to achieve balance between this objective and the vulnerability of

"legitimate governmental and private interests [that] could be harmed by release of certain types

of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871,

872 (D.C. Cir. 1992); *see also Summers*, 140 F.3d at 1079.  Accordingly, FOIA provides nine

exemptions pursuant to which an agency may withhold requested information.  *See* 5 U.S.C. §§

552(a)(4)(B), (b)(1)-(9).  The agency must demonstrate the validity of any exemption that it

asserts.  *See id.*; *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("[c]onsistent with the

purpose of the Act, the burden is on the agency to justify withholding requested documents").  In

addition, summary judgment may be granted on the basis of the agency's accompanying

affidavits or declarations if they describe "the justifications for nondisclosure with reasonably

specific detail, demonstrate that the information withheld logically falls within the claimed

exemption, and are not controverted by either contrary evidence in the record nor evidence of

agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  These

affidavits may be submitted by an official who coordinated the search, and need not be from each

individual who participated in the search.  *See SafeCard Servs. v. Sec. & Exch. Comm'n*, 926

F.2d 1197, 1200 (D.C. Cir. 1991).

An agency also has the burden of detailing what proportion of the information in a

document is non-exempt and how that material is dispersed throughout the document.  *Mead

Data Cent. Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).  Any non-exempt

information that is reasonably segregable from the requested records must be disclosed.  *Oglesby

v. Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996) ("*Oglesby I*").  In addition, district courts are

required to consider segregability issues *sua sponte* even when the parties have not specifically

raised such claims.  *Trans-Pac. Policing Agreement v. Customs Serv.*, 177 F.3d 1022, 1028 (D.C.

17

Cir. 1999).

      *B.*     *Privacy Act*

The Privacy Act of 1974 regulates the collection, maintenance, use, and dissemination of an individual's personal information by agencies within the federal government. *See* 5 U.S.C. § 552a(e). The PA provides that any agency that retains a system of records "shall maintain . . . only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or executive order of the President." 5 U.S.C. § 552a(e)(1). To provide for openness and accountability, the PA ensures that "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system," the agency shall provide the individual with access to review such records. 5 U.S.C. § 552a(d)(1). Finally, subject to certain exceptions, the Privacy Act states that disclosure of records shall be limited. 5 U.S.C. § 552a(b) ("[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains"). One of these exceptions, however, is that an agency shall disclose such records that would be required to be disclosed pursuant to FOIA. 5 U.S.C. § 552a(b)(2). In actions seeking documents under both FOIA and the Privacy Act, a defendant agency must show that the information is properly subject to both FOIA and Privacy Act exemptions. *See Martin v. Off. of Special Counsel*, 819 F.2d 1181, 1184 (D.C. Cir. 1987).

## III.  DISCUSSION

*A.      Adequacy of the CIA's Search*

In determining the adequacy of a FOIA search, the Court is guided by principles of reasonableness.  *Oglesby v. Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("*Oglesby II*").  To obtain summary judgment on the issue of the adequacy of the records search, an agency must show, "viewing the facts in the light most favorable to the requester, that . . . [it] has conducted a 'search reasonably calculated to uncover relevant documents.'"  *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (hereinafter "*Weisberg II*")).  That is, an agency must show that it made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Ogelsby II*, 920 F.2d at 68; *see also Campbell v. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998).  An agency's search need not be exhaustive, merely reasonable.  *See W. Ctr. for Journalism v. Internal Rev. Servs.*, 116 F. Supp. 2d 1, 8 (D.D.C. 2000) (citing *Shaw v. Dep't of State*, 559 F. Supp. 1053, 1057 (D.D.C. 1983)).

To meet its burden, the agency may submit affidavits or declarations that explain both in reasonable detail and in a nonconclusory fashion the scope and method of the agency's search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982).  "'[I]n adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon [such] agency affidavits.'"  *Morley v. CIA*, 508 F. 3d 1108, 1116 (D.C. Cir. 2007) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979)).  "However, such reliance is only appropriate when the agency's supporting affidavits are 'relatively detailed' and nonconclusory and . . . submitted in good faith.'"  *Id.*

19

(quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  If the affidavits or declarations are

appropriately detailed, such affidavits or declarations are sufficient to demonstrate an agency's

compliance with the FOIA, in the absence of contrary evidence.  *Perry*, 684 F.2d at 127.  By

contrast, "'if the sufficiency of the agency's identification or retrieval procedure is genuinely in

issue, summary judgment is not in order.'"  *Id.* at 126 (quoting *Founding Church of Scientology*,

610 F.2d at 836).

Here, Plaintiff makes two principal challenges to the adequacy of the CIA's search.  As

discussed above, IMS tasked the DO and the MSO, but not the DI, the DS&T, or the DCI Area,

to conduct searches in response to Plaintiff's FOIA/PA Request.  DiMaio Decl. ¶¶ 34, 37.

Plaintiff first challenges the CIA's initial decision to task only the DO and the MSO directorates

to search for responsive records, and not to task either the DI or DCI Area directorates to search

for such records, arguing that the failure to search the DI's and the DCI Area's records renders

the CIA's search inadequate under FOIA.[12]  Pl.'s Cross-Mot./Opp'n at 5-9; Pl.'s Reply at 11-26.

Second, even assuming that the CIA's decision to limit the search to the DO and the MSO

directorates was reasonable, Plaintiff argues that the CIA's search of the DO and the MSO

directorates was inadequate because: (1) the CIA has failed to provide an adequate description of

the searches conducted by the DO and MSO directorates; and (2) the DO and the MSO searches

failed to uncover certain records, thereby demonstrating that the searches were inadequate.  Pl.'s

Cross-Mot./Opp'n at 4-9; Pl.'s Reply at1-11.  The Court shall address each argument in turn.

---

[12]Plaintiff does not challenge the CIA's decision not to task the DS&T directorate to
search for records responsive to Plaintiff's FOIA/PA Request.  *See* Pl.'s Cross-Mot./Opp'n at 5-
9.

1.      Search of the DI and the DCI Area Records

First, Plaintiff challenges the CIA's decision not to task the DI or the DCI Area to

conduct searches in response to his FOIA/PA Request.  "There is no requirement that an agency

search every record system."  *Oglesby II*, 920 F.2d at 68 (citing *Marks v. DOJ*, 578 F.2d 261, 263

(9th Cir. 1978) (no requirement that an agency search every division or field office on its own

initiative in response to a FOIA request when the agency believes responsive documents are

likely to be located in one place)).  Rather, an agency is only required to search those record

systems that are likely to turn up the information requested.  *See id.*  Accordingly, an agency is

required to explain its determination that the record systems searched are the only ones likely to

include responsive records.  *Id.*

Here, the Court concludes that the CIA has explained in a reasonably detailed and

nonconclusory manner that it determined, based on the respective functions of each directorate,

that only the DO and the MSO were likely to contain responsive material and that neither the DI

or the DCI Area was likely to have responsive records.  DiMaio explains that, upon receipt of

Plaintiff's FOIA/PA Request, IMS tasked the DO and the MSO with processing Plaintiff's

FOIA/PA Request, based upon its determination that these were the two components most likely

to possess responsive records, if any existed.  DiMaio Decl. ¶ 34.  IMS did not task the DI or the

DCI Area to conduct searches in response to the request based upon their respective functions.

*Id.* ¶ 37.  Specifically, DiMaio avers that, given the analysis-based mission of the DI, IMS

officers determined that the DI was not likely to have any records responsive to Plaintiff's

FOIA/PA Request.  *Id.*  Similarly, DiMaio explains that, given the function of the DCI Area and

the offices encompassed therein, IMS decided that the DCI Area was not likely to have any

responsive records either.  *Id.*  DiMaio further avers that "[n]othing in the responsive records
retrieved by a search of DO records suggested that a search of directorates [specifically including
the DI and the DCI Area] would be reasonably likely to retrieve responsive records."  Supp.
DeMaio Dec. ¶ 7. Plaintiff has failed to rebut the reasonableness of the CIA's determination that
neither the DI or the DCI Area was likely to contain responsive information by coming forward
with any objective evidence to suggest to the contrary, as discussed below.

a.   DI Records

Plaintiff asserts that the CIA's decision not to search DI records renders the CIA's search
inadequate for two reasons.  First, Plaintiff alleges that "documents which the CIA did locate and
has described in its *Vaughn* index (Documents 1-5) show that the CIA was interested in
Schoenman's travels to foreign countries and his talks with foreign leaders."  Pl.'s Cross-
Mot./Opp'n at 6.  Based on Plaintiff's opinion that "[t]his is precisely the sort of event which one
could reasonably expect to generate intelligence analysis," Plaintiff concludes that the CIA's
decision not to search the DI's records was unreasonable.  *See id.*  Second, Plaintiff provides
what he describes as "many more examples of [his] activities and contacts with world leaders
around the globe," as well as his involvement with several organizations that he claims were of
interest to the CIA, which Plaintiff claims "ensures that the . . . DI . . . [has] records" responsive
to Plaintiff's FOIA/PA request.  *Id.; see also* Pl.'s Reply at 12-13.  Neither of Plaintiff's
arguments have merit.

First, the Court cannot agree with Plaintiff that the descriptions of Documents 1-5 in the
CIA's *Vaughn* index support his assertion that the DI is likely to have responsive records.  As an
initial matter, Plaintiff's argument is based on his characterization of the five responsive

documents at issue—*i.e.*, his belief that the documents are primarily directed at Plaintiff's own

activities and discussions, such that the material demonstrates the CIA was specifically interested

in Plaintiff's travels to foreign countries and his talks with foreign leaders.  In fact, however,

Plaintiff's characterization of the documents is based on nothing more than his own speculation

that he is the primary subject of Documents 1-5, as the *Vaughn* index indicates at most only that

Plaintiff's name was mentioned in five DO records containing information on visits to foreign

countries, and discussions of foreign officials as well as various international political groups.

*See* DiMaio Decl. at 51-53.  More importantly, however, DiMaio's Declaration specifically avers

that "[n]othing contained in the responsive records located by the DO [led] trained CIA IMS

professionals to believe that it would be reasonably likely for the DI to have responsive records."

Supp. DeMaio Dec. ¶ 7.  Plaintiff offers no contrary evidence—other than his own

speculation—to contradict the reasonableness of the CIA's conclusion.  In the absence of

contrary evidence, DiMaio's reasonable and nonconclusory explanation for why the CIA did not

search the DI records system is sufficient.  *Perry*, 684 F.2d at 126.

Plaintiff's second argument is similarly without merit.  Plaintiff opines that the CIA was

undoubtedly interested in his many overseas activities as well as the organizations of which he

was a member, and that the DI therefore must have records concerning him.  Plaintiff, however,

offers no evidence other than his own speculation to support his claims that the CIA was

interested in him and maintained DI records on his overseas activities.  Plaintiff's own conjecture

"is hardly proof that such documents exist."  *Morley*, 508 F.3d at 1120.  Moreover, "[t]he D.C.

Circuit has made clear that a FOIA requester who challenges the reasonableness of a search

'because the agency did not find responsive documents that [the requester] claims must exist'

cannot sustain that challenge when he 'provides no proof that these documents exist and [offers

only] his own conviction that [an event] was of such importance that records must have been

created.'" *Judicial Watch, Inc. v. Food & Drug Admin.*, 514 F. Supp. 2d 84, 88 (D.D.C. 2007)

(quoting *Oglesby II*, 920 F.2d at 67, n.13); *see also Martinale v. CIA*, Civ. A. No. 03-1632, 2005

WL 327119, *3 (D.D.C. Feb. 9, 2005) ("Plaintiff's strong belief that defendants possess

responsive documents beyond those disclosed is nothing more than speculation, and therefore is

insufficient to raise a genuine issue of material fact with respect to the adequacy of the searches

conducted by defendants."). Accordingly, the Court finds that the CIA's "detailed [declaration]

stating that it has no reason to believe materials will be found in those components withstand[s]

[Plaintiff's] generalized attack. Therefore, in the absence of such evidence, we decline to require

the [CIA] to search [DI] files." *Weisberg II*, 745 F.2d at 1487.

        b.     DCI Area Records

Plaintiff also argues that the CIA's decision not to search the DCI Area's records was

unreasonable. As above, Plaintiff provides what he describes as "examples of [his] activities and

contacts with world leaders around the globe," as well as his involvement with several

organizations that he claims were of interest to the CIA, and argues that his involvement with

these activities "ensures that the . . . DCI Area. . . [has] records" responsive to Plaintiff's

FOIA/PA Request. Pl.'s Cross-Mot./Opp'n at 6. For example, the heart of Plaintiff's argument

as it concerns the DCI Area is his belief that the DCI Area should reasonably be expected to have

records concerning Plaintiff because the former Director of Central Intelligence, Richard Helms,

and the former General Counsel of the CIA, Lawrence Houston—both of whose records would

be located in the DCI Area—were interested in activities in which Plaintiff was involved. *See*

Pl.'s Cross-Mot./Opp'n at 7-8; Pl.'s Reply at 13-16.  More specifically, Plaintiff asserts that "it was well known that the [former] Director of Central Intelligence Richard Helms was intensely interested in District Attorney Jim Garrison's investigation into the assassination of President John F. Kennedy," and that "Schoenman met Garrison personally and provided him with information that had appeared in an Italian newspaper" concerning the CIA's alleged involvement in President Kennedy's assassination.  Pl.'s Cross-Mot./Opp'n at 7-8.  Plaintiff therefore concludes that "[g]iven Helms' intense interest in Garrison's investigation, . . .  it is unlikely that the Director of Central Intelligence's files do not contain records pertaining to Schoenman."  *Id.* at 8; *see also* Pl.'s Reply at 13-16.  Plaintiff also submits a Declaration of Professor Joan Mellen, author of a book discussing Garrison's investigation into the assassination of President Kennedy, in which Professor Mellen supports Plaintiff's contention that former "DCI Helms [was] deeply interested in the Garrison investigation."  Decl. of Joan Mellen, Professor of English and Creative Writing at Temple University, (hereinafter "Mellen Decl."), submitted in support of Plaintiff's Reply, ¶ 6.  Professor Mellen further avers that "the CIA's [former] General Counsel, Lawrence Houston, who reported directly to DCI Helms, was personally and extensively involved in the CIA's investigation of a host of people who met, wrote, or phoned Garrison, or who, in some way, were said or reported to have come to Garrison's attention."  *Id.* ¶ 7.  As mentioned above, Plaintiff states that he met with Garrison to provide him with information regarding a story that had appeared in an Italian newspaper, and Professor Mellon therefore concludes: "It is my opinion, based on my extensive experience with the CIA's records on Jim Garrison's investigation, that the DCI Area could reasonably be expected to have records pertaining to Ralph Schoenman."  *Id.*  ¶ 8.

The Court finds Plaintiff's argument is without merit.  Essentially, Plaintiff's argument boils down to the assertion that, because former DCI Helms and former General Counsel Houston were interested in the Garrison investigation and because Plaintiff met once with Garrison to inform him about an Italian newspaper article concerning the CIA's alleged involvement in President Kennedy's assassination, the DCI Area would reasonably be expected to have records concerning Plaintiff.  "This is hardly proof that such documents exist."  *Morley*, 508 F.3d at 1120.  The Court agrees with the CIA that, even assuming that Helms and Houston were interested in Garrison's investigation, it does not follow that the DCI Area would be reasonably expected to have records concerning Plaintiff simply because he met once with Garrison to provide him with information regarding an Italian newspaper article.

More importantly, however, the Court finds that Plaintiff has not provided any objective evidence to support his contention.  Admittedly, Plaintiff relies not just on his own opinion, but has also submitted the declaration of Professor Mellen, who concurs with Plaintiff in his conclusion that the DCI Area would be reasonably expected to have documents on Plaintiff's involvement with the Garrison investigation.  However, with due respect for Professor Mellen's experience researching the Garrison investigation, her declaration is insufficient to raise a material doubt as to the reasonableness of the CIA's decision—ultimately, neither she nor Plaintiff has presented any objective evidence that the CIA unreasonably concluded that the DCI Area was not likely to contain responsive records.  Although both she and the Plaintiff sincerely believe that the CIA would have been "intensely interested" in Plaintiff's meeting with Garrison, as discussed above, the unsupported conviction that an event "was of such importance that records must have been created'" is insufficient to challenge the adequacy of an agency's search.

*See Oglesby II*, 920 F.2d at 67, n.13.  Accordingly, as with Plaintiff's argument concerning the

DI records, the Court once again finds that the CIA's detailed declaration averring that it had no

reason to believe responsive records would be found in the DCI Area is sufficient to withstand

Plaintiff's generalized attacks.  *See Weisberg II*, 745 F.2d at 1487.  The Court therefore declines

to require the CIA to search the DCI Area.

Accordingly, the Court shall GRANT the CIA's Motion for Summary Judgment and shall

DENY Plaintiff's Cross-Motion for Summary Judgment to the extent Plaintiff challenges the

CIA's decision not to task the DI and the DCI Area with responding to Plaintiff's FOIA/PA

Request.

2.      Search of the DO and the MSO Records

Plaintiff next challenges the adequacy of the CIA's search of the DO and the MSO

records.  Plaintiff makes two principal arguments.  First, Plaintiff contends that the CIA has

failed to provide an adequate description of the searches conducted by the DO and the MSO

directorates.  Second, Plaintiff argues that the CIA's failure to uncover certain records

demonstrates that the searches conducted by the DO and the MSO were inadequate.  The Court

shall address each in turn.

a.      Adequacy of the CIA's Search Description

Plaintiff first contends that "[t]he CIA's description of its search methodology is sparse,"

Pl.'s Cross-Mot./Opp'n at 8, and that it has provided only "bare conclusory allegations" that its

search of the DO and the MSO directorates was adequate, Pl.'s Reply at 4.  Ultimately, although

the CIA has, to its credit, provided some information regarding the search of the DO's and the

MSO's records, the Court agrees with Plaintiff that the CIA has failed to "explain in reasonable

detail the scope and method of the search conducted by the agency [sufficient] to demonstrate

compliance with the obligations imposed by the FOIA." *See Perry*, 684 F.2d at 127.

The principal deficiency in DiMaio's Declarations is that, while he incorporates a lengthy

discussion of the CIA's procedure for reviewing and processing FOIA requests in general, he

fails to include sufficient reasonable detail as to the specific search conducted in response to

Plaintiff's FOIA/PA Request.  For example, DiMaio explains that, upon receipt of a FOIA

request, IMS forwards copies of the requester's letter to those directorates that reasonably might

be expected to possess records responsive to the request, which are then tasked with conducting

searches among all directorate components, indices and databases that they determine reasonably

might be expected to have any information responsive to the request—here, the DO and the

MSO.  DiMaio Decl. ¶ 28.  DiMaio's Declaration, however, provides only two terse paragraphs

directly discussing the manner in which the DO and the MSO conducted their searches for

responsive records in this case.  *See id.* ¶¶ 35, 36.  For example, as to the DO's search, DiMaio

explains only that:

> The DO made all reasonable efforts to identify and retrieve any records responsive
> to plaintiff's PA request.  The DO searched using the plaintiff's first and last names.
> The DO records system accounts automatically for variations in spelling of the first
> and last name.  Five responsive documents . . . were located.

*Id.* ¶ 35.  Similarly, as to the MSO search, DiMaio provides only that:

> The MSO also made all reasonable efforts to identify and retrieve any records
> responsive to plaintiff's PA request.  The MSO searched using plaintiff's name and
> variants thereof.  No responsive records were located.  Examples of the search terms
> used by the MSO include, for example: "Ralph Benedek Schoenman,""Ralph B.
> Schoenman," "R Schoenman," "Schoenman," "Schonman," and "Schoeman."

*Id.* ¶ 36.  Although the DiMaio's Declaration does indicate the search terms used and the number

of responsive documents located, as well as aver that all files likely to contain responsive

materials were searched, the declaration does *not* indicate "'how the search was conducted' in

each component,"as is required. *Morley*, 508 F.3d at 1122 (quoting *Oglesby II*, 920 F.2d at 68).

This is of particular concern given DiMaio's explanation that the CIA's records systems and

indexing systems vary among the agency's components, and that the CIA's ability to retrieve data

from a given records system varies, depending upon the type of information stored in that system

and the way the system is designed to retrieve that information. *See* DiMaio Decl. ¶ 21.  Thus, as

described by DiMaio, it would appear that each directorate tasked with searching for records

responsive to a FOIA request must first make an individualized determination as to which

directorate components, indices, and databases to search and then make an individualized

determination as to what method to use in light of the type of information stored in that system

and the way that system is designed.  The CIA, however, has not provided *any* such information

as to how the DO and the MSO conducted their record searches.

The D.C. Circuit's decision in *Morley* is particularly illustrative.  In *Morley*, the plaintiff

alleged that the CIA had failed to adequately describe its search and the D.C. Circuit agreed,

finding that, although the CIA's supporting declaration included an explanation of how the

agency  generally responds to FOIA requests, it failed to include information about the actual

search strategies used by the components charged with responding to the plaintiff's request.  508

F.3d at 1121-22.  The D.C. Circuit remanded the case with instructions for the CIA to expand its

description of the search conducted.  *Id.*  Here, as in *Morley*, the CIA has provided a lengthy

description of the CIA's general process for complying with the FOIA and the PA, but has failed

to provide reasonable detail as to the specific searches conducted in response to Plaintiff's

particular FOIA/PA Request.  Admittedly, the question in this case is a closer one than in

*Morley*, as here the CIA has provided information concerning the search terms used and the

number of responsive documents located as a result of each directorate's search.  However, in

view of Plaintiff's concerns and the CIA's failure to provide any information as to the manner in

which the DO and the MSO in fact conducted their respective searches, the Court finds that "the

Declaration's terse treatment of the CIA's efforts to locate documents that were responsive to

[Plaintiff's] FOIA request lacks the detail 'necessary to afford a FOIA requester an opportunity to

challenge the adequacy of the search and to allow the district court to determine if the search was

adequate in order to grant summary judgment.'" *Id.* at 1122 (quoting *Oglesby II*, 920 F.2d at

68).[13]  Accordingly, the appropriate response at this juncture is to require the CIA expand its

description of the search it conducted.

b.      Missing Records

Plaintiff further argues that the Court should find not only that the CIA's search

description is insufficiently detailed, but that the actual search of the DO and the MSO

directorates was inadequate because there are certain documents that the CIA should have—but

did not—produce in response to his FOIA/PA Request.  Plaintiff makes four specific arguments,

---

[13]The Court notes that Plaintiff originally argued in his Cross-Motion/Opposition that the
CIA's search was inadequate because it had not searched its operational files as required under
the CIA Information Act.  Pl.'s Cross-Mot./Opp'n at 4-5.  In response, the CIA provided a
supplemental declaration by DiMaio, attached to its Opposition/Reply, in which DiMaio
specifies that "[t]he CIA searched its operational files in response to Plaintiff's Privacy Act."  *Id.*
¶ 4.  Given DiMaio's representations, Plaintiff, in his Reply, no longer asserts that the CIA failed
to search its operational records, but rather continues to emphasize the inadequacy of the CIA's
search description—particularly of its operational files.  *See* Pl.'s Reply at 4-5.  Accordingly, the
Court understands that Plaintiff's original complaints regarding the CIA's search of its
operational records are now subsumed into Plaintiff's general complaints regarding the adequacy
of the CIA's search description.

which he alleges demonstrates the inadequacy of the CIA's search: (1) that the DO and the MSO must have records regarding Plaintiff in light of the breadth of his activities and contacts around the globe; (2) that the CIA's *Vaughn* index itself demonstrates that other responsive records exist but have not been produced; (3) that the CIA has failed to produce records of its search, as requested; and (4) that the CIA has failed to produce "index references," as requested.  The Court finds that Plaintiff's first three arguments are without merit.  However, as to Plaintiff's final argument concerning the "index references," as the CIA has not addressed Plaintiff's allegations in its pleadings, the Court is without sufficient information to decide the issue on the current record.  Accordingly, the Court shall require the CIA to provide an explanation as to why no "index references" were provided to Plaintiff.

First, Plaintiff again alleges that "Schoenman's activities and contacts with world leaders around the globe [] ensure that the CIA's [] DO [and] MSO all have records which have not been produced."  Pl.'s Cross-Mot./Opp'n at 6; Pl.'s Reply at 5-10.  The Court need not dwell long on these speculative allegations, as the Court has already twice rejected this argument above.  *See supra* 25-26.  Accordingly, because Plaintiff has provided no proof that such documents exist, other than his own belief that the CIA must have been interested in his activities, the Court finds that Plaintiff's argument fails.  *See Judicial Watch*, 514 F. Supp. 2d at 88 ( "a FOIA requester who challenges the reasonableness of a search 'because the agency did not find responsive documents that [the requester] claims must exist' cannot sustain that challenge when he 'provides no proof that these documents exist and [offers only] his own conviction that [an event] was of such importance that records must have been created.'") (quoting *Oglesby II*, 920 F.2d at 67, n.13); *see also Steinberg*, 23 F.3d at 552 ("mere speculation that as yet uncovered

31

documents may exist does not undermine the finding that the agency conducted a reasonable search").

Second, Plaintiff alleges that the description of Document 1 in the *Vaughn* index "seems to indicate that it sought background information on Schoenman from CIA headquarters," and "[s]ince the CIA has not accounted for [a] response to this request for background information, its *Vaughn* index is itself evidence of the inadequacy of its search."  Pl.'s Cross-Mot./Opp'n at 8. As an initial matter, the description of Document 1 in the *Vaughn* index indicates only that the "cable is requesting background information on a visit to a foreign country."  *See* DiMaio Decl. at 51.  Plaintiff's conclusion that the document is requesting background information specific to him is mere speculation, and Plaintiff's conjecture that there must be a response to this document is "hardly proof that such a document exists."  *Morley*, 508 F.3d 1108.  Regardless, even assuming Plaintiff is correct, the "failure of an agency to turn up one specific document in its search does not alone render a search inadequate."  *Id.* (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)).

Third, Plaintiff challenges the adequacy of the CIA's search by noting that, although his FOIA/PA Request sought copies of "all search slips or other records used in searching his request," such materials have not been provided to him.  Pl.'s Cross-Mot./Opp'n at 8.  The CIA responds that it provided Plaintiff with actual notice that its search for documents would be for documents in existence as of the cut-off date, September 18, 2001—*i.e.*, the date of the acceptance letter and the date the CIA's search was initiated.  Def.'s Opp'n/Reply at 10. Accordingly, the CIA concludes that "records documenting the CIA's search, while processing Plaintiff's request, are not within the scope of Plaintiff's request."  *Id.*  Plaintiff counters by

asserting that he was not, in fact, given actual notice of the cut-off date as it applied to his request

for search records and that the CIA has not demonstrated conclusively that no search records

were created before September 18, 2001.  Pl.'s Reply at 2-4.  It is, however, undisputed that the

CIA informed Plaintiff by letter on September 18, 2001, that "[o]ur search will be for documents

in existence as of and through the date of this acceptance letter."  DiMaio Decl., Ex. B.

Plaintiff's argument that the CIA's notice was ineffective because it did not specify that the cut-

off date applied to each and every aspect of Plaintiff's FOIA/PA Request, including the request

for search records, is plainly without merit, as is Plaintiff's similar assertion that the notice was

ineffective because the CIA did not advise that search records would not be created until after the

cut-off date.  Pl.'s Reply at 2-3.  Although the D.C. Circuit has observed that "[i]t would be

extremely difficult for the CIA to convince us that it may 'reasonably' use any cut-off date

without so informing the requester," *McGehee v. CIA*, 697 F.2d 1095, 1105 (D.C. Cir. 1983*), the*

CIA did in fact clearly notify Plaintiff that the September 18, 2001 cut-off date would apply to

Plaintiff's FOIA/PA Request.  The fact that the CIA did so as to the entire FOIA/PA Request

without also specifying that the cut-off date applied to each and every aspect of the FOIA/PA

Request does not render the notice ineffective.  As to the second argument, Plaintiff offers no

contrary evidence—other than his own conjecture—to contradict DiMaio's statement that

"'[s]earch slips, if any, would not have been created until after the CIA's search was completed."

Supp. DiMaio Decl. ¶ 9.  The Court therefore finds that Plaintiff has not sufficiently rebutted the

CIA's nonconclusory declaration averring that no such documents were created prior to the

September 18, 2001 cut-off date in this case.

Nonetheless, Plaintiff responds in his Reply that application of the September 18, 2001

cut-off date to his request for search records was unreasonable and that the CIA should have instead used the date when the search was completed as the cut-off date for those specific records.  Pl.'s Reply at 3-4.  For support, Plaintiff relies on *Public Citizen v. Dep't of State*, 276 F.3d 634, 643-44 (D.C. Cir. 2002).  Plaintiff's reliance, however, is misplaced.  In *Public Citizen*, the D.C. Circuit concluded that the State Department's previous date-of-*request* cut-off policy was unreasonable both on its face and as applied—but it did not reject a date-of-search cut-off policy or require that an agency apply varying cut-off dates to the several aspects of a plaintiff's FOIA request.  *See* 276 F.3d at 637, 643-44.  To the contrary, in rejecting the date-of-request cut-off policy, the D.C. Circuit explicitly suggested that the State Department consider a "date-of-*search* cut-off," which is precisely what the CIA applied in the instant case.  *Id.* at 644 (emphasis in original).  *Public Citizen* thus does not establish that the CIA's application of a date-of-search cut-off date to all aspects of Plaintiff's FOIA/PA request was unreasonable.

More importantly, this Court previously concluded that Plaintiff's request for search records is inconsistent with Supreme Court precedent holding that the FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created or retained."  *Schoenman v. FBI*, 573 F. Supp. 2d 119, 140 (D.D.C. 2008) (citing *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980)).  In asking the CIA to provide him with documentation that may or may not exist but which, in any event, was created during the course of searching for records responsive to Plaintiff's FOIA/PA Request, Plaintiff essentially seeks to have the CIA create or retain such documents.  The Court again declines to condone such a request.

Fourth and finally, Plaintiff notes that his FOIA/PA Request also sought "all index

34

references," which the CIA has not produced.  Pl.'s Cross-Mot./Opp'n at 8.  The Court notes

that, although the CIA provided an explanation as to why no search records were produced, it has

not offered a similar explanation as to why no "index references" were provided to Plaintiff.  *See*

*generally* Def.'s Mot.; Def.'s Opp'n/Reply.  Accordingly, the Court shall require that, in

supplementing the description of its search, the CIA must also provide an explanation for its

failure to provide "index references" to Plaintiff, as requested.

In summary, the Court concludes that the CIA must supplement its search description to

provide a reasonably detailed description of the search as conducted by the DO and the MSO

directorates and also provide an explanation as to why it has not provided Plaintiff with "index

references," as requested in his FOIA/PA Request.  The Court, however, finds that Plaintiff has

not shown, on the record now before the Court, that the CIA's search of the DO and the MSO

records was otherwise inadequate.  Accordingly, the Court shall HOLD IN ABEYANCE the

parties' cross-motions as to the adequacy of the CIA's search of the DO and the MSO

directorates, pending supplemental briefing by the parties in conformity with this Memorandum

Opinion.  Specifically, the CIA shall file, by no later than April 10, 2009, a supplemental

description of its search and an explanation as to why "index references" were not provided to

Plaintiff.  Plaintiff may file a targeted opposition, if appropriate, by no later than April 24, 2009,

that addresses only those new issues raised in the CIA's filing.  The CIA may file a reply, if

appropriate, by no later than May 6, 2009.

B.    *FOIA and Privacy Act Exemptions*

As explained above, the CIA determined that certain documents must be withheld, wholly

or in part, pursuant to FOIA Exemptions 1 and 3, as well as PA Exemptions (j)(1) and (k)(1).

Plaintiff disputes the CIA's reliance on FOIA Exemptions 1 and 3, but does not dispute the

CIA's reliance on PA Exemptions (j)(1) and (k)(1).  *See* Pl.'s Cross-Mot./Opp'n at 9-16; Pl.'s

Reply at 16-17.  Accordingly, the Court shall address only those exemptions in dispute—FOIA

Exemptions 1 and 3.

Before doing so, however, the Court pauses to note that the CIA has provided

descriptions of the documents and its withholdings in its *Vaughn* index, which is located at pages

51-57 of the DiMaio Declaration.  The *Vaughn* index addresses not only the CIA's withholding

determinations as to those records located by the CIA itself, but also as to the records referred to

the CIA by the Department of State and the DIA as well as to the records for which the

Department of State coordinated with the CIA.  Specifically:

• Documents 1- 5 reference the five documents located by the CIA in response to Plaintiff's FOIA/PA Request to the CIA, each of which were withheld in their entirety;

• Documents 6-7 reference the two documents referred to the CIA by the Department of State and that were released in part;

• Documents 8-10 reference the three documents for which the Department of State sought coordination with the CIA and that were released in part (P107; P334; P244); and

• Documents 11-115 reference the one CIA document referred to the CIA by the DIA and that was withheld in full (Document 11), as well as the 103 FBIS transcripts referred to the CIA by the DIA and that were withheld in part (Documents 12-115).

*See* DiMaio Decl. at 51-57.

Finally, the Court emphasizes that, although the review is *de novo* of the CIA's use of a

FOIA exemption to withhold documents, the D.C. Circuit has cautioned that "in conducting *de*

*novo* review in the context of national security concerns, courts 'must accord *substantial weight*

to an agency's affidavit concerning the details of the classified status of the disputed record.'"

*Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (hereinafter "*Wolf I*") (quoting *Military Audit Project*, 656 F.2d at 738 (emphasis in original)).  "Moreover, a reviewing court 'must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Id.* (quoting *Halperin v. CIA,* 629 F.2d 144, 149 (D.C. Cir. 1980)).  "Ultimately, an agency's justification for invoking a FOIA  exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* at 274-75.

   1. <u>Exemption 1</u>

   The CIA withheld information contained in Documents 1-5 and 7-11 pursuant to Exemption 1.  Under FOIA Exemption 1, an agency is permitted to withhold "matters" from FOIA disclosure if such matters are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The CIA relies on Executive Order 12,958, as amended (hereinafter "EO 12,958").  *See* 68 Fed. Reg. 15,315 (2003).  To show that it has properly withheld information under FOIA Exemption 1, the CIA must show both that the information was classified pursuant to the proper procedures, and that the withheld information substantively falls within the scope of EO 12,958.  *See Salisbury v. United States*, 690 F.2d 966, 971-72 (D.C. Cir. 1982).  Importantly, the D.C. Circuit has observed that "the text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."  *Morley*, 508 F.3d 1124.

   The CIA has provided a reasonably detailed and nonconclusory description of both its procedural and substantive compliance with EO 12,958 in determining that material contained in

Documents 1-5 and 7-11 should be withheld.  Specifically, DiMaio explains that, pursuant to EO 12,598, information may be originally classified only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under control of the United States; (3) the information falls within one or more of several enumerated categories of information; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security and the original classification authority is able to identify or describe the damage.  DiMaio Decl. ¶ 41(citing EO 12,958, § 1.1(a)).

DiMaio first details the process utilized for determining whether the records at issue are or should be classified.  First, DiMaio explains that the Director of the CIA has delegated original TOP SECRET classification authority to him.  *Id.* ¶ 43.  Second, DiMaio avers that he has reviewed Documents 1-5 and 7-11 and has determined that they are owned by the U.S. Government, produced by the U.S. Government, and under the control of the U.S. Government. *Id.* ¶ 44.  Third, DiMaio explains that he also reviewed the documents at issue and concluded that they contain information that falls within the classification categories in the Executive Order, specifically "intelligence activities," "intelligence sources or methods, or cryptology," and "foreign relations or foreign activities of the United States."  *Id.* ¶ 45 (quoting EO 12,958, § 1.4(b)-(d)).  Fourth, DiMaio explains that he has determined that disclosure of the information contained in Documents 1, 3-5, and 11, could reasonably be expected to result in serious damage to the national security, and that the documents were thus classified SECRET, and that the information contained in Documents 2 and 7-10, could reasonably be expected to result in damage to the national security if disclosed and that the documents were thus classified as

CONFIDENTIAL.[14]  *Id.* ¶ 46.  Finally, DiMaio explains that the other requirements of EO

12,958 were met, as he reviewed each document to ensure that no information has been classified

for an improper or illegal purpose, and that each document has been properly marked.  *Id.* ¶¶ 49-

50.

DiMaio next provides a significantly detailed explanation demonstrating that the

materials at issue substantively fall within one or more of five categories within the scope of the

Executive Order, namely: (1) intelligence activities; (2) intelligence information; (3) intelligence

methods; (4) foreign activities; and (5) foreign relations.  *See* EO 12,598, § 1.4.  First, DiMaio

explains that Documents 1-5 and 7-11 contain information about CIA intelligence activities.  *Id.*

¶ 54.  The CIA asserts that the disclosure of information regarding specific intelligence activities

conducted by the CIA would reveal not only those specific activities but the interests and the

capabilities of the CIA as well, which information could be used by foreign intelligence services

and others who have interests opposed to those of the United States.  *Id.*  It is averred that these

parties search constantly for information regarding the activities of the CIA and are able to gather

information from myriad sources, analyze this information, and create ways to defeat CIA

activities from seemingly disparate pieces of information.  *Id.*  Second, DiMaio explains that

Documents 1-5 and 7-11 also contain information that relates to CIA sources of intelligence

information.  *Id.* ¶ 56.  He avers that intelligence sources will furnish information only when they

_____

[14]As DiMaio explains, EO 12,598 "provides that information shall be classified at one of
three levels if the unauthorized disclosure of the information reasonably could be expected to
cause damage to the national security, and the original classification authority is able to identify
or describe the damage."  DiMaio Decl. ¶ 46.  As is relevant here, "[i]nformation shall be
classified . . . SECRET if its unauthorized disclosure reasonably could be expected to cause
serious damage to the national security, and CONFIDENTIAL if its unauthorized disclosure
could be expected to cause damage to the national security."  *Id.*

are confident that they are protected from retribution or embarrassment by absolute secrecy surrounding the source-CIA relationship. *Id.* "Intelligence sources" may include individual human sources as well as components of foreign governments, such as intelligence and security services. *Id.* ¶ 58. As DiMaio explains in significant detail, the disclosure of either type of intelligence source risks damaging not only the CIA's relationship with a particular source, but could also hamper the CIA's ability to recruit future sources as well as endanger the United States' relationship with foreign governments that have agreed to provide sensitive information in strict confidence. *See id.* ¶¶ 59-68. Third, DiMaio explains that the documents at issue contain information concerning intelligence methods—including field installations, foreign liaison relationships, cryptonyms and pseudonyms, as well as dissemination and control markings. *Id.* ¶¶ 69-87. Again, he provides significant detail explaining that a particular intelligence method is effective only so long as it remains unknown and unsuspected by its target. *Id.* ¶ 71. When a particular intelligence method ceases to be effective, the United States endures a significant loss, both in terms of the cost of developing and validating a new intelligence method and the loss of intelligence during the time it takes to fund and field a replacement method. *Id.* ¶ 73. Fourth, DiMaio explains that Documents 1-5 and 7-11 also contain information about foreign activities, disclosure of which could reveal CIA intelligence gathering activities in foreign countries, thereby allowing the United States' adversaries to take steps to prevent future activities of this type and directed at the same target. *Id.* ¶¶ 88-90. Fifth and finally, DiMaio avers that the documents in question also contain information withheld that concerns United States foreign relations, the release of which could negatively affect the United States' relationship with those foreign government who provided the assistance. *Id.* ¶ 91-94. To

the extent the information may reveal that a foreign government is cooperating with the United

States, any official acknowledgment by the CIA of past or current liaison relationships could

cause serious damage to relations with those governments and foreign intelligence services, and

would likely result in a significant loss of intelligence information or foreign cooperation for the

United States.  *Id.* ¶ 92.  In addition, to the extent that the CIA is engaging in activities in foreign

countries about which those foreign countries are unaware, public confirmation of those activities

could result in damage to the United States' relationship with those countries.  *Id.* ¶ 93.

Plaintiff asserts three principal arguments against the CIA's reliance on Exemption 1.

First, Plaintiff generally disputes the CIA's use of Exemption 1, arguing that the CIA has not

sufficiently explained how disclosure of the materials in question would cause harm to the

national security given the age of the materials and the fact that there have allegedly been

"massive disclosures" of information concerning the issues in which Plaintiff was involved.  Pl.'s

Cross-Mot./Opp'n at 9-12.  Second, Plaintiff argues that, to the extent the CIA seeks to withhold

information pertaining to intelligence sources under Exemption 1, it must indicate whether the

sources are dead or alive, active or inactive, or publicly revealed.  *Id.* at 15.  Third, Plaintiff more

specifically challenges the CIA's use of Exemption 1 in relation to two documents—Document 1

and Document 2—which Plaintiff contends contain "nothing secret."  *Id.* at 14.  The Court

determines, however, that Plaintiff's arguments for declassification "do[] not overcome the

'substantial weight' the court must accord 'to an agency's affidavit concerning the details of the

classified status of the disputed record[s].'"  *Id.* (quoting *Military Audit Project*, 656 F.2d at 738).

First, Plaintiff alleges that the information at issue is improperly classified under EO

12,958 because it is more than 40 to 50 years old.  Pl.'s Cross-Mot./Opp'n at 9-12.  Plaintiff

directs the Court to the text of EO 12,598, which requires that the original classification authority "shall attempt to establish a specific date or event for declassification" and provides that records that "(1) are more than 25 years old and (2) have been determined to have permanent historical value . . . shall be automatically declassified." *Id.* at 10 (citing EO 12,598 §§ 1.5, 3.3). Plaintiff argues that the CIA has not stated that it complied with this automatic declassification provision, and alleges that the materials at issue are more than 25 years old and have permanent historical value, such that they should be declassified. *Id.* Given the age of the material at issue and the "drastic change in national security concerns since the Vietnam War era," Plaintiff argues the materials are no longer a risk to national security. *See id.* at 9-12.

The CIA responds that EO 12,598 exempts from the above-quoted automatic declassification requirement nine categories of information, including information "the release of which should be expected to: (1) reveal the identity of a confidential human source, or reveal information about the application of an intelligence source or method ; . . . (6) reveal information that would seriously and demonstrably impair relations between the United States and a foreign government, or seriously and demonstrably undermine ongoing diplomatic activities of the United States." Def.'s Reply at 11-12 (citing EO 12,598, §§ 3.3(b)(1), (6)). As DiMaio attests in his supplemental declaration, he re-reviewed each of the documents described in the CIA's *Vaughn* index during the current litigation process and determined that Documents 1-5 and 7-11 each contain information falling within the two categories above, thus exempting those records from automatic declassification and warranting their continued classification despite their age. Supp. DiMaio Decl. ¶¶ 10-11. Indeed, the D.C. Circuit has explicitly recognized that "the passage of time alone is [not] enough to discredit an otherwise detailed and persuasive affidavit."

42

*Ogelsby v. U.S. Dep't of Army*, 79 F.3d 1172, 1183 (D.C. Cir. 1996).[15]  The Court notes that

Plaintiff has not renewed the argument in his Reply that the CIA failed to comply with the

automatic declassification provisions of the EO 12,958, and the Court therefore assumes that

Plaintiff concedes, as he must, that the CIA has in fact complied with the Executive Order's

requirements.  *See* Pl.'s Reply. at 16-17.

The D.C. Circuit, however, has left open the possibility that a FOIA requester may be

able to challenge an agency's reliance on Exemption 1 if he or she "could show that the withheld

information is substantially similar to information the government has declassified because of its

age." *Id.* at 1183.  Although Plaintiff alleges that "[h]undreds of books and articles have been

published on the policies of the United States and the CIA during this period," that "the CIA

itself has released a report by the CIA Inspector General on its assassination plots against Cuban

Prime Minister Fidel Castro" as well as "a massive 400-page report on Lee Harve [*sic*] Oswald's

activities in Mexico City," and that "over 300,000 pages of CIA records concerning its activities

---

[15]Plaintiff cites to *King v. DOJ*, 803 F.2d 210 (D.C. Cir. 1987), as well as to Judge Gladys Kessler's slip opinions in *Keenan v. DOJ*, Civ. Act. N. 94-1909, attached as Exs. 3 and 4 to Plaintiff's Cross-Motion/Opposition, as support for his contention that the material should be declassified because of its age.  Neither case, however, alters this Court's holding that the mere passage of time alone is insufficient to discredit the CIA's detailed and nonconclusory declaration that the material at issue remains properly classified.  For example, in *King*, the government had failed to provide any substantive explanation for its continued classification of the documents at issue, offering only its assurance that the declassification decisions were procedurally compliant.  805 F.2d at 226-28.  Here, however, the CIA has provided a detailed, nonconclusory description of its compliance with both the procedural and substantive provisions of EO 12,598.  Similarly, in *Keenan*, Judge Kessler observed that "passage of time alone is not a per se bar to Exemption 1 claims, so long as the agency provides a sufficiently detailed and persuasive affidavit that adequately demonstrates the national security concerns covered under the applicable Executive Order."  *Keenan v. DOJ*, Civ. Act. N. 94-1909, slip op. at 11 (D.D.C. Mar. 24, 1997).  Because the agency in *Keenan*—unlike the CIA in the instant case—had failed to provide any such information, Judge Kessler found the agency's affidavit was inadequate. Accordingly, both cases are inapposite to the situation at hand.

against Fidel Castro and Cuba have been revealed in great detail," these allegations, even if true,

do not demonstrate that the information withheld by the CIA is "substantially similar." *See* Pl.'s

Cross-Mot./Opp'n at 11. As the D.C. Circuit has observed,

> [P]rior disclosure of similar information does not suffice; instead, the specific
> information sought by the plaintiff must already be in the public domain by official
> disclosure. The insistence on exactitude recognizes the Government's vital interest
> in information relating to national security and foreign affairs.

*Morley*, 508 F.3d at 1124 (internal quotation marks omitted); *see also Assassination Archives

and Research Ctr.,* 334 F.3d at 58 (plaintiff must make "*specific*" showing that the previous

disclosures "revealed information that is 'as specific as' and 'match[es] that included'" in the

withheld information) (emphasis in original) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765

(D.C. Cir. 1990)). Plaintiff has, at most, demonstrated that similar information has been

revealed. Plaintiff, however, is required to provide the Court with "specific information that was

previously released and is now withheld." *Morley*, 508 F.3d at 1124. As Plaintiff has not done

so, his challenge to the CIA's general reliance on Exemption 1 fails. *Id.*

Second, Plaintiff argues that, to the extent the CIA seeks to withhold information

pertaining to intelligence sources under Exemption 1, it must indicate whether the sources are

dead or alive, active or inactive, or publicly revealed or secret. Pl.'s Cross-Mot./Opp'n at 15.

However, "[a]n agency may redact, pursuant to Exemption[] 1 . . . the identity of an individual

regardless of whether he/she is alive." *Schrecker v. DOJ*, 14 F. Supp. 2d 111, 118 (D.D.C.

1998). Indeed, the D.C. Circuit has recognized that the CIA may have a genuine interest in

protecting the confidentiality of its intelligence sources, regardless of whether the amount of time

that has passed and whether the source is alive or dead. *See Schrecker v. DOJ*, 254 F.3d 162,

376 (D.C. Cir. 2001) ("[I]it is logical to conclude that the need to assure confidentiality to a foreign source includes neither confirming or denying the existence of records even decades after the death of the foreign national."). Here, DiMaio avers that "[i]ntelligence sources will furnish information only when they are confident that they are protected from retribution or embarrassment by absolute secrecy surrounding the source-CIA relationship. In other words, intelligence sources must be certain that the CIA will do everything in its power to prevent the public disclosure of their association with the CIA." DiMaio Decl. ¶ 57. The Court agrees with the CIA that it is "logical" to conclude that the need to assure the appearance of confidentiality is so essential that it may protect the identity of intelligence sources from disclosure even after they are deceased, inactive, or indeed, made public through other means. *See Wolf I*, 473 F.3d at 374-75 ("an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible'"). As the D.C. Circuit has observed:

> [M]aintaining the confidentiality of intelligence sources' identities has two purposes: protection of persons or entities that are or have been sources, and insurance (or inducement) both for current sources to remain so and future, potential sources to become sources. Thus, "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."

*Fitzgibbon*, 911 F.2d at 763-64 (quoting *CIA v. SIMS*, 471 U.S. 159, 175 (1985)).

Third and finally, Plaintiff's specific claims as to Documents 1 and 2 are similarly without merit. Plaintiff argues that Documents 1 and 2 "concern Schoenman's travels to meet with foreign officials" and that "[t]here was nothing secret about Schoenman's trips and meetings with foreign officials." Pl.'s Cross-Mot./Opp'n at 14. In addition, Plaintiff contends that "other government agencies, such as the State Department, have released information concerning" those

alleged visits.  *Id.*  As an initial matter, the *Vaughn* index describes Document 1 as a "cable []

requesting background information on a visit to a foreign country" and Document 2 as a "report

[] regarding discussions with a foreign official . . . cover[ing] the foreign officials concerns about

multilateral international issues."  DiMaio Decl. at 51.  Plaintiff's assumption that the documents

focus entirely on his travel is speculation only.  More importantly, the CIA explains that

Document 1 contains information that would reveal "intelligence sources and methods, the

location of a CIA overseas installation, the name of CIA employees, cryptonyms, foreign

activities of the CIA, [and] information affecting foreign relations."  *Id.*  According to the

*Vaughn* index, Document 2 likewise contains information that would reveal "intelligence sources

and methods, the location of a CIA overseas installation, the name of a CIA employee,

pseudonyms and cryptonyms, foreign activities of the CIA, information affecting foreign

relations and dissemination-control markings."  *Id.* at 51-52.  Plaintiff has not offered any

evidence—other than his own conjecture—that contradicts the CIA's detailed affidavits averring

that the material in Documents 1 and 2 are properly classified.  Nor has Plaintiff provided the

Court with "specific information that was previously released and is now withheld."  *Morley*, 508

F.3d at 1124.  Rather, Plaintiff offers only the generalized assertion that "other government

agencies, such as the State Department, have released information concerning" Plaintiff's

activities.  Pl.'s Cross-Mot./Opp'n at 14.  As discussed above, Plaintiff's generalized attack is

insufficient.  *Morley*, 508 F.3d at 1124 ("the specific information sought by the plaintiff must

already be in the public domain by official disclosure").  Accordingly, in light of the *substantial

weight* this Court must give to an agency's affidavit concerning the details of the classified status

of the disputed record and Plaintiff's failure to offer any contradictory evidence, the Court cannot

say that the CIA's determination that the withheld material continues to warrant classification

under EO 12,598 is either illogical or implausible.  *See Wolf I*, 473 F.3d at 374-75 ("an agency's

justification for invoking a FOIA  exemption is sufficient if it appears 'logical' or 'plausible'").

The Court therefore shall GRANT Defendant's Motion for Summary Judgment and DENY

Plaintiff's Cross-Motion for Summary Judgment with respect to FOIA Exemption 1.

       2.    <u>Exemption 3</u>

In addition, the CIA withheld information contained in Documents 1-115 pursuant to

Exemption 3.   Under Exemption 3, an agency may withhold matters that are "specifically

exempted from disclosure by statute . . ., provided that such statute (A) requires that the matters

be withheld from the public in such a manner as to leave no discretion on the issue, or (B)

establishes particular criteria for withholding or refers to particular types of matters to be

withheld."  5 U.S.C. § 552(b)(3).  Here, the CIA explains that the material at issue is properly

withheld under section 102A(i)(1) of the National Security Act, 50 U.S.C. § 403-1(i)(1), which

requires the DCI[16] to protect intelligence sources and methods from unauthorized disclosure, and

section 6 of the Central Intelligence Agency Act, 50 U.S.C. § 403(g), which provides that the

CIA is exempt from the provisions of any law that require the publication or disclosure of the

organization, functions, names, official titles, salaries, or number of personnel employed.  Def.'s

Mot. at 21.  It is well established that these provisions of the National Security Act and the

Central Intelligence Agency Act are "precisely the type of statutes comprehended by exemption

3."  *Goland*, 607 F.2d at 349 (quoting *Weissman v. CIA*, 565 F.2d 692, 694 (D.C. Cir. 1977)).

---

[16]As a result of the agency restructuring that took place after the enactment of the IRTPA, the new Director of National Intelligence has assumed the duties previously delegated to the DCI under Section 102A(i)(1) of the National Security Act.  *See Wolf I*, 473 F.3d at 377, n.6.

The D.C. Circuit has further "explained that 'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'" *Morley*, 508 F.3d at 1126.

Pursuant to the Central Intelligence Agency Act, the CIA has withheld material from Documents 1-115 that relates to the agency's functions, as well as the names of its employees and personal identifiers (*e.g.*, employee signatures and initials), official titles, file numbers, and internal organization data. DiMaio Decl. ¶ 102. As DiMaio explains, "[t]he CIA has withheld this information to prevent the publication of CIA personnel, structure, organization and procedures, which could be used asa a tool for hostile penetration or manipulation." *Id.* The Court notes that Plaintiff has not challenged the CIA's use of Exemption 3, to the extent it withholds information required under the Central Intelligence Agency Act, *see* Pl.'s Cross-Mot./Opp'n at 15-16, and rightly so given that the CIA has sufficiently shown that its withholding of such information is, at a minimum, "plausible." *Wolf I*, 473 F.3d at 374.

The CIA has also withheld material from Documents 1-5 and 7-11, pursuant to the National Security Act. Specifically, the CIA has withheld information that would reveal intelligence methods and sources if disclosed, as discussed above. DiMaio Decl. ¶ 99. This Court must give "even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act." *Wolf I*, 473 F.3d at 377 (citing *SIMS*, 471 U.S. at 168-69). "Because the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after, the Director of Central Intelligence may protect all intelligence sources, regardless of their provenance." *Id.* (internal

quotation marks and citations omitted).  As discussed above, the CIA has provided significant

detailed, nonconclusory explanations as to the information in Documents 1-5 and 7-11 that, if

disclosed, would reveal intelligence sources and methods.  *See supra* at 37-47.  Given the

substantial weight the Court is required to give the CIA's judgment as to the effect of disclosure,

the Court has no trouble concluding that the CIA's may withhold this information under

Exemption 3.  *See Assassination Archives and Research Ctr.*, 334 F.3d at 58.

This is particularly so given that Plaintiff's only argument against the CIA's use of

Exemption 3 is that the CIA's "definition of 'intelligence methods' is far too broad to be

consistent with the purposes of the [FOIA]," because, for example, "[i]t would include reading a

newspaper, going to the library, and all manner of gathering information for which there is no

need for secrecy."  Pl.'s Cross-Mot./Opp'n at 16.  However, as the CIA responds, DiMaio in fact

specifically describes the intelligence methods at issue in each Document in its *Vaughn* index,

and specifies that the intelligence methods at issue include field installations, foreign liaison

relationships, the use of cryptonyms and pseudonyms, and the use of dissemination-control

markings.  *See* DiMaio Decl. at 51-57.  Moreover, the D.C. Circuit has explicitly rejected the

argument that the CIA may only protect information concerning unknown intelligence methods

and that the CIA must otherwise disclose generally known intelligence methods, such as physical

surveillance or monitoring airline manifests.  *See Fitzgibbon*, 911 F.2d at 763.  In *Fitzgibbon*, the

D.C. Circuit recognized that, "in considering the potential harm arising from disclosure of a

source or method, '[w]e must take into account . . . that each individual piece of intelligence

information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of

information even when the individual piece is not of obvious importance itself.'"  911 F.2d at

763 (quoting *Gardels v. CIA,* 689 F.2d 1100, 1106 (D.C.Cir.1982)).  Accordingly, the CIA may

refrain from disclosing the fact that it uses even the simplest of intelligence gathering methods.

*See id.*  Accordingly, as Plaintiff's argument concerning the breadth of the CIA's definition of

"intelligence methods" is without merit, and he makes no other challenges to the CIA's reliance

on Exemption 3, the Court shall GRANT Defendant's Motion for Summary Judgment and

DENY Plaintiff's Cross-Motion for Summary Judgment with respect to FOIA Exemption 3.

C.      *Segregability*

While agencies may properly withhold certain materials under FOIA's enumerated

exemptions, they must release "any reasonably segregable portions" of responsive documents

once they have redacted the exempted information.  *See* 5 U.S.C. § 552(b).  The segregability

requirement is of such great import that this Court has an affirmative duty to engage in its own

segregability analysis, regardless of Plaintiff's pleadings.  *See Billington v. DOJ*, 233 F.3d 581,

586 (D.C. Cir. 2000).  The question of segregability is "subjective based on the nature of the

document in question, and an agency must provide a reasonably detailed justification rather than

conclusory statements to support its claim that the non-exempt material in a document is not

reasonably segregable.  *Mead Data*, 566 F.2d at 261.  Although the agency's justification need

not compromise the nature of the withheld information, its explanation should at least detail what

proportion of the information in a document is non-exempt and how that material is dispersed

throughout the document.  *See id.*  "This Circuit has long recognized [] that documents may be

withheld in their entirety when nonexempt portions 'are inextricably intertwined with exempt

portions.'" *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008) (quoting *Mead Data*, 566 F.2d at

260).  Accordingly, "[a] court may rely on government affidavits that show with reasonable

50

specificity why documents withheld pursuant to a valid exemption cannot be further segregated for this reason."  *Id.*

For the information withheld by the CIA, DiMiao avers that he conducted "a line-by-line review . . . for all the documents at issue to identify and release meaningful, reasonably segregable, and nonexempt portions of documents."  DiMaio Decl. ¶ 104.  DiMaio further explains that "[t]he determination of segregability was made based upon a careful review of the documents in this case, both individually, and as a whole," and that "IMS officers considered the entire mosaic of information available, including information that may be publicly available in other cases or available to our adversaries through their intelligence activities, to determine if any releases would reveal classified, statutorily protected, or otherwise exempt information."  *Id.* ¶ 104.  DiMaio concludes that "[i]n most instances, the nature of the withholdings is such that any release of the withheld information would reveal intelligence sources and methods or information that is otherwise statutorily exempt from disclosure."  *Id.*  Accordingly, based upon that review, the CIA determined that, as to six of the documents at issue—Documents 1-5 and Document 11—"[t]he nonexempt information is so inextricably intertwined with the exempt information that release of the nonexempt information would produce only incomplete, fragmented, unintelligible sentences and phrases composed of isolated, meaningless words."  *Id.* ¶ 103.  The CIA therefore withheld Documents 1-5 and 11 in their entirety "because there is no meaningful nonexempt information that reasonably can be segregated from the exempt information"—*i.e.*, because the documents contain only "isolated" words and "fragmented" sentences of non-exempt material that are "inextricably intertwined with the exempt information."  *Id.*  As to the remaining 109 documents, the CIA determined based upon its "line-by-line" review "that some

of the nonexempt information could be released to plaintiff," and therefore released those documents in part. *Id.* ¶ 104.

Plaintiff disputes the CIA's segregability determination, making three primary arguments, none of which the Court finds persuasive. First, Plaintiff argues that the CIA improperly withheld Documents 1-5 and 11 in their entirety because it could have reasonably segregated and released certain isolated words, such as dates, Plaintiff's name, and any pseudonyms or cryptonyms, and also could have reasonably segregated and released "the basic letterhead or format information" contained in the material. Pl.'s Cross-Mot./Opp'n at 13-14; Pl.'s Reply at 16-17. As to the release of pseudonyms or cryptonyms, the Court has already held that this information may be reasonably withheld pursuant to Exemptions 1 and 3, *see supra* at 40, 46-47, so Plaintiff is wrong to suggest such information is nonexempt in the first instance. In addition, as the CIA notes, it has already provided Plaintiff with the relevant dates in the *Vaughn* index. *See* Def.'s Reply at 16; DiMaio Decl. at 51-57. More importantly, the Court agrees with the CIA that it makes little sense to require it to spend time and resources redacting entire documents in order to provide Plaintiff with his name, dates he has already been provided, and the basic letterhead or formatting of the document. Although "a court should [not] approve an agency withholding because of the court's low estimate of the value to the requester of the information withheld," the D.C. Circuit has nonetheless made clear that "a court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data*, 566 F.2d at 369, n. 54. Here, the CIA made its segregability determination based on its reasonable, and non-conclusory conclusion that the "fragmented" and "isolated" occurrences

of non-exempt material in the documents at issue are so "inextricably intertwined with the exempt information" that the non-exempt material could not be reasonably segregated—and not on any impermissible determination that the substantive content of the non-exempt information, although reasonably segregable, "provides no meaningful information." *See Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 733-34 (D.C. Cir. 2008). Accordingly, the CIA has adequately demonstrated, in reasonable, non-conclusory detail, that non-exempt material may not be reasonably segregated and Plaintiff has not shown to the contrary.

Second, Plaintiff argues that, as a result of the CIA's use of an "overbroad definition of intelligence methods," the CIA has improperly withheld nonexempt information. Pl.'s Reply at 17. This argument is easily dispensed with, as the Court has already found that the CIA has not used an overbroad definition of "intelligence methods" in withholding information pursuant to Exemption 3 and that the CIA's reliance on Exemption 3 is appropriate. *See supra* 49-50. Accordingly, the Court finds that Plaintiff's argument on this point is equally without merit.

Thus, the CIA has produced a *Vaughn* index including a detailed description of the material that it withheld from disclosure and corresponding explanations as to why the information was not released to Plaintiff, and Plaintiff has offered no contrary evidence. *See* DiMaio Decl. at 51-57. On this record, the Court finds that Defendant has set forth a sufficiently detailed segregability analysis. *Cf. Stolt-Nielsen Transp. Grp. Ltd.*, 534 F.3d at 733-34 (emphasizing that "'an agency cannot justify withholding an entire document simply by showing that it contains some exempt material,'" but not disturbing the well-established precedents allowing an agency to withhold non-exempt information that is, as here, "inextricably intertwined" with exempt information) (quoting *Mead Data Cent., Inc.*, 566 F.2d at 260).

Accordingly, the Court shall GRANT Defendant's Motion for Summary Judgment and shall

DENY Plaintiff's Cross-Motion for Summary Judgment as to the issue of segregability.

> D.      *Discovery*

Finally, the Court notes that Plaintiff has requested discovery in this action in order to

address the CIA's application of FOIA Exemptions 1 and 3.  *See* Pl.'s Cross-Mot./Opp'n at 14,

15.  The CIA responds that "[d]iscovery is generally unavailable in FOIA actions," and that it is

unwarranted in this case.  Def.'s Opp'n/Reply at 18 (quoting *Wheeler v. CIA*, 271 F. Supp. 2d

132, 139 (D.D.C. 2003)).  The CIA is correct that courts have routinely held that "[d]iscovery

'should be denied where an agency's declarations are reasonably detailed, submitted in good faith

and the court is satisfied that no factual dispute remains.'" *Wolf v. CIA*, 569 F. Supp. 2d 1, 9-10

(D.D.C. 2008) (hereinafter "*Wolf II*") (quoting *Schrecker v. DOJ*, 217 F. Supp. 2d 29, 35

(D.D.C.2002)); *see also Allen v. U.S. Secret Serv.*, 335 F. Supp. 2d 95, 100 (D.D.C. 2004) ("It is

well-settled in a FOIA action, the court must 'deny discovery when the affidavits are sufficiently

detailed and submitted in good faith.'") (quoting *Kay v. FCC*, 976 F. Supp. 23, 34, n. 35 (D.D.C.

1997)).  Rather, discovery is generally appropriate only when the plaintiff has raised a sufficient

question as to the agency's good faith.  *Wolf II*, 569 F. Supp. 2d at 10.  "Where an agency's

declarations are deficient, courts generally will request that an agency supplement its supporting

declarations rather than order discovery."  *Id.*

Here, Plaintiff has not raised a sufficient question as to the CIA's good faith.  As to FOIA

Exemptions 1 and 3, the issues for which Plaintiff has specifically requested discovery, the CIA

has submitted declarations that provide reasonably detailed, nonconclusory explanations as to the

CIA's reliance on those Exemptions and, given the disposition of the parties' cross-motions for

summary judgment on those issues, it is clear that the Court is satisfied that no factual dispute

remains as to the CIA's withholdings.  In addition, although Plaintiff has not specifically

requested discovery as concerns the adequacy of the CIA's search, *see generally* Pl.'s Cross-

Mot./Opp'n, the Court notes that it has ordered the CIA to supplement its search description, *see*

*supra* at 35.  *See Wolf II*, 569 F. Supp. 2d at 10 ("Where an agency's declarations are deficient,

courts generally will request that an agency supplement its supporting declarations rather than

order discovery.").  Accordingly, the Court shall DENY Plaintiff's request for discovery.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT-IN-PART the CIA's [64] Motion

for Summary Judgment and shall DENY-IN-PART Plaintiff's [70] Cross-Motion for Partial

Summary Judgment, finding in favor of Defendant CIA as to (1) the adequacy of the CIA's

search, to the extent the CIA declined to task the Directorate of Intelligence and the independent

entities that report to the Director of Central Intelligence to conduct a search in response to

Plaintiff's FOIA/PA Request, (2) the CIA's withholding of information, (3) the CIA's

segregation of non-exempt information, and (4) Plaintiff's request for discovery.  The Court

cannot, however, ultimately resolve the parties' cross-motions as to the adequacy of the CIA's

search of the Directorate of Operations' and the Mission Support Offices' records because the

CIA has not provided a reasonably detailed and nonconclusory description of its search of those

records.  In the absence of this information, the Court cannot determine whether the CIA's search

of those records was adequate.  As such, the Court shall HOLD IN ABEYANCE the parties'

cross-motions for summary judgment with respect to the adequacy of the CIA's search as it

concerns the DO and the MSO pending supplemental briefing from the parties.  Accordingly, the

CIA is required to file, by no later than April 10, 2009, a supplemental description of its search

and an explanation as to why "index references" were not provided to Plaintiff, in accordance

with this Memorandum Opinion.  Plaintiff may file an opposition, if appropriate, by no later than

April 24, 2009, and the CIA a reply, if appropriate, by no later than May 6, 2009.

Date:    March 19, 2009

                                                    _/s/_____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge