# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RALPH SCHOENMAN,

    *Plaintiff*,

    v.

FEDERAL BUREAU OF
INVESTIGATION, *et al.*,

    *Defendants*.

Civil Action No. 04-02202 (CKK)

## MEMORANDUM OPINION
(February 9, 2011)

Plaintiff Ralph Schoenman ("Schoenman"), a self-described political activist and author,

commenced this action against a variety of named and unnamed agencies, including the Federal

Bureau of Investigation (the "FBI"), pursuant to the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552, and the Privacy Act of 1974 (the "Privacy Act"), 5 U.S.C. § 552a, seeking an array

of records concerning himself, Lord Bertrand Russell, and various named organizations. This

Court previously granted-in-part and denied-in-part the parties' respective cross-motions for

summary judgment and the parties were instructed to, and in fact did, file renewed motions

addressing various concerns identified by the Court. Presently before the Court is the FBI's

[135] Partial Renewed Motion for Summary Judgment ("Renewed Motion for Summary

Judgment") and Schoenman's [143] Renewed Cross-Motion for Summary Judgment and Other

Relief ("Renewed Cross-Motion for Summary Judgment"). Based upon the parties' submissions,

the relevant authorities, and the record as a whole, the Court shall GRANT the FBI's Renewed

Motion for Summary Judgment and DENY Schoenman's Renewed Cross-Motion for Summary

Judgment.[1]  Furthermore, because there are no viable claims remaining against the FBI in this action, the Court shall DISMISS the FBI as a defendant.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in detail the extensive history of this case, and shall therefore only address the factual and procedural background necessary to address the discrete issues currently before the Court.

By letters dated July 24, 2001 and July 27, 2001, Schoenman, through counsel, submitted various FOIA requests to the FBI seeking the disclosure of an array of records pertaining to a variety of subjects including himself, Lord Bertrand Russell, and six named organizations.[2]

---

[1]  The Court has considered the following documents in the course of rendering its decision, listed in chronological order of their filing: Def.'s Mem. of P. & A. in Supp. of Partial Renewed Mot. for Summ. J. ("Def.'s Mem."), Docket No. [135]; Def.'s Stmt. of Material Facts as to Which There Is No Genuine Issue, Pursuant to Local Civil Rule 7(h), Docket No. [135]; Sixth Decl. of David M. Hardy ("6th Hardy Decl."), Docket No. [135-1]; Pl.'s Mem. of P. & A. in Supp. of Pl.'s Renewed Cross-Mot. for [Summ.] J. and Other Relief and in Opp'n to Def. Federal Bureau of Investigation's Renewed Partial Mot. for Summ. J. ("Pl.'s Mem."), Docket No. [143]; Pl.'s Stmt. of Material Facts, Docket No. [143-12]; Decl. of Ralph Schoenman in Resp. to Sixth Hardy Decl. ("Schoenman Decl."), Docket No. [143-10]; Decl. of James H. Lesar ("Lesar Decl."), Docket No. [143-11]; Def.'s Opp'n to Pl.'s Mot. for "Other Relief," Docket No. [142]; Def.'s Opp'n to "Pl.'s Renewed Cross-Mot. for Summ. J. and Other Relief" and Reply to Pl.'s Opp'n in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s 2d Mem."), Docket No. [141]; Def.'s Counter-Stmt. of Material Facts, Docket No. [141]; Pl.'s Reply to Def. Federal Bureau of Investigation's Opp'n to Pl.'s Renewed Cross-Mot. for Summ. J. ("Pl.'s 2d Mem."), Docket No. [148]; Pl.'s Notice of Filling [sic] of Corrected Exhibits ("Pl.'s Suppl. 2d Mem."), Docket No. [149]; Pl.'s Notice of Filing ("Pl.'s 3d Mem."), Docket No. [150]; Def.'s Resp. to Pl.'s October 8, 2010 "Notice of Filing" ("Def.'s 3d Mem."), Docket No. [151]; Seventh Decl. of David M. Hardy ("7th Hardy Decl."), Docket No. [151-1].  The parties have filed a variety of notices and supplemental papers relating to the pending motions and other past and present motions.  For purposes of economy, the Court shall not cite to those documents here, but notes that it renders its decision today upon the parties' submissions, the attachments thereto, and the record as a whole.

[2]  The six organizations are: the Bertrand Russell Peace Foundation; the Bertrand Russell Peace Foundation, New York; the International War Crimes Tribunal; the Who Killed Kennedy

Second Decl. of David M. Hardy, Docket No. [73-1], ¶¶ 5, 28, 41, 49, 61 & Exs. A, X, KK, SS, BBB. The FBI acknowledged receipt of Schoenman's requests and searched its records, producing some materials and withholding others in full or in part. *Id.* ¶¶ 10, 14, 16, 37-40, 45, 54, 57, 60, 62-63 & Exs. F, I, K, GG, HH, II, JJ, OO, AAA, CCC, DDD. Unsatisfied with the FBI's response, Schoenman commenced this action on December 20, 2004, naming the FBI as a defendant along with a host of other identified and unidentified agencies subject to similar requests for information. Compl., Docket No. [1]. In the succeeding years, Schoenman's claims have been successively winnowed down by orders of this Court, two of which merit explicit mention here because they pertain to Schoenman's claims against the FBI in particular.

On June 5, 2006, the Court dismissed without prejudice certain claims against the FBI based upon Schoenman's failure to exhaust his administrative remedies. *Schoenman v. Fed. Bureau of Investigation*, No. 04 Civ. 2202 (CKK), 2006 WL 1582253 (D.D.C. June 5, 2006). Thereafter, the parties agreed to proceed with motions for summary judgment based upon a sample of the records withheld in full or in part by the FBI. *See* Joint Status Report, Docket No. [34], at 4; Joint Status Report, Docket No. [41], at 2. Schoenman selected the records to serve as the subject of the FBI's *Vaughn* index[3] and, using that sample as the focus point, Schoenman and the FBI each moved for summary judgment. *See* Mot. for Summ. J. on Behalf of Def. Federal Bureau of Investigation, Docket No. [73]; Pl.'s Cross-Mot. for Summ. J., Docket No. [92].

---

Committee; the Bertrand Russell Research Center; and the Citizens Committee of Inquiry.

[3] In *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), the United States Court of Appeals for the District of Columbia Circuit held that agencies should generally prepare an itemized index correlating each withheld document (or portion thereof) with a specific exemption and the agency's justification for non-disclosure.

On March 31, 2009, the Court issued a decision addressing the parties' respective cross-motions for summary judgment. *Schoenman v. Fed. Bureau of Investigation*, 604 F. Supp. 2d 174 (D.D.C. 2009). In that decision, the Court found as follows: the FBI had improperly denied Schoenman's requests for a fee waiver; Schoenman had conceded that the FBI's search for responsive records was reasonable; and the FBI's proffered *Vaughn* index was defective. *See generally id.* On this final point, the Court characterized the FBI's *Vaughn* index as "utterly inadequate" and proceeded to identify a litany of infirmities in the FBI's submissions at that time. *See id.* at 194-204. While the Court shall describe those infirmities in greater detail in the course of evaluating the adequacy of the revised *Vaughn* index now relied upon by the FBI, *see infra* Part III.B, at this point it suffices to observe that the infirmities were sufficiently pronounced so as to prevent the Court from evaluating the propriety of the FBI's withholding decisions and assessing whether the FBI should be required to reprocess or release records responsive to Schoenman's requests. *See Schoenman*, 604 F. Supp. 2d at 195-96. The Court therefore denied the parties' respective cross-motions for summary judgment without prejudice as they pertained to these issues, with leave to renew after the FBI prepared a proper *Vaughn* index. *Id.*

Shortly thereafter, the parties jointly submitted a proposed schedule for resolving the outstanding issues identified by the Court in its decision. *See* Joint Status Report & Proposed Briefing Schedule, Docket No. [113]. By mutual agreement, the FBI would first reprocess the full universe of responsive documents and re-release the disclosable portions thereof to Schoenman. *Id.* at 2. Thereafter, Schoenman would select a sample of approximately 10% of all responsive records to serve as the subject of a revised *Vaughn* index. *Id.* At the penultimate step, the parties would meet and confer to review each document selected by Schoenman and

address any misunderstandings.  *Id.* at 4.  Only thereafter would the parties file renewed motions for summary judgment.  *Id.*

The Court agreed with the proposed course of action and entered a schedule corresponding to the steps identified by the parties.  Min. Order (Apr. 21, 2009).  By July 1, 2009, the FBI had reprocessed all of the records responsive to Schoenman's requests—a total of 3,987 pages—and produced the disclosable parts thereof to Schoenman.  *See* Status Report, Docket No. [118], at 1.  Schoenman then selected 402 pages to serve as the representative sample—10.1% of all responsive records—and the parties certified that they were in agreement as to the composition of the sample.  Joint Status Report, Docket No. [123], at 1.  Unfortunately, the process unraveled when, in the course of preparing its Renewed Motion for Summary Judgment, the FBI discovered that additional material within the sample could be released.  6th Hardy Decl. ¶ 34.  That discovery prompted the FBI to reprocess the full universe of responsive records a second time.  *Id.*  Based upon that second reprocessing, the FBI supplemented its production to Schoenman, ultimately producing 2,983 out of a total of 3,987 pages to Schoenman on January 19, 2010.  *Id.* ¶ 34 & Ex. S.  Regrettably, neither party took the reasonable step of advising the Court of these developments.  *See infra* Part III.A.1.  Instead, the parties proceeded to brief their renewed cross-motions for summary judgment.  The FBI filed its [135] Renewed Motion for Summary Judgment on January 21, 2010.  *See* Def.'s Mem.  Schoenman filed his [143] Renewed Cross-Motion for Summary Judgment on March 3, 2010.  *See* Pl.'s Mem.  After a series of successive filings, some of which were filed out of time and without prior leave of the Court, both motions have now been fully briefed and are ripe for adjudication.

## II. LEGAL STANDARD

Congress enacted FOIA to introduce transparency into government activities. *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984). Congress remained sensitive, however, to the need to achieve balance between this objective and the vulnerability of "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 984 (1993). For this reason, FOIA provides nine exemptions pursuant to which an agency may withhold requested information. *See* 5 U.S.C. § 552(b)(1)-(9). "Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents," *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993), and only after an agency has proven that it has fully discharged its obligations is summary judgment appropriate, *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).

In reviewing motions for summary judgment in this context, the district court must conduct a *de novo* review of the record, 5 U.S.C. § 552(a)(4)(B), which "requires the court to ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure," *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (internal quotation marks omitted). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The agency must show, viewing the facts in the light most favorable to the requester, that there is no genuine issue

of material fact.  *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).  With these principles in mind, the Court turns to the merits of the parties' renewed cross-motions for summary judgment.

### III.  DISCUSSION

The Court's discussion proceeds in six parts: first, the Court shall explain why Schoenman is not entitled to a further reprocessing of the records responsive to his requests based upon the FBI's decision to reprocess the records a second time or as a result of the purported "error rate" in its reprocessing efforts, *see infra* Part III.A; second, the Court shall explain why, despite Schoenman's myriad arguments to the contrary, the FBI has discharged its burden of providing an adequate *Vaughn* index, *see infra* Part III.B; third, the Court shall explain why the FBI has met its burden of justifying the invocation of various exemptions to the disclosure of information responsive to Schoenman's requests, *see infra* Part III.C; fourth, the Court shall explain why it is satisfied that the FBI has disclosed all reasonably segregable items of information responsive to Schoenman's requests, *see infra* Part III.D; fifth, the Court shall explain why Schoenman may not relitigate the reasonableness of the FBI's search for records, *see infra* Part III.E; and sixth, and finally, the Court shall explain why Schoenman is not entitled to discovery in this action, *see infra* Part III.F.

### A.       *Schoenman Is Not Entitled to a Further Reprocessing of the Records Responsive to His Requests*

At the outset, the Court must address two preliminary issues that, depending on their outcomes, could have reverberations across the parties' respective cross-motions for summary judgment.  Briefly stated, Schoenman claims that various defects in the FBI's procedures for processing the records responsive to his requests require a further reprocessing of all the records

7

at issue in this action. Pl.'s Mem. at 2-5; Pl.'s 2d Mem. at 1-7. Distilled to their essence, his arguments divide into two categories. Schoenman first asserts that the FBI's decision to unilaterally undertake a second reprocessing of all the records at issue, after the parties had already agreed upon the composition of the sample to be used for purposes of briefing their respective motions for summary judgment, undermines the representativeness of the sample selected. Pl.'s 2d Mem. at 1-7. Next, Schoenman argues that the "error rate" in the FBI's reprocessing efforts is unacceptably high, such that further reprocessing is required. Pl.'s Mem. at 2-5; Pl.'s 2d Mem. at 7. The Court addresses each argument in turn.

### 1. Further Reprocessing Is Not Warranted Based Upon the FBI's Second Reprocessing Efforts and Supplemental Production

After the FBI had already once reprocessed the records at issue in this action and the parties had agreed upon the composition of the representative sample to be used for purposes of briefing the parties' motions for summary judgment, unbeknownst to the Court or Schoenman, the FBI unilaterally decided to reprocess the full universe of records responsive to Schoenman's requests a second time. Two days before it filed its Renewed Motion for Summary Judgment, the FBI supplemented its production to release additional information previously withheld. Now, Schoenman contends that the FBI's course of conduct vitiates the representativeness of the sample, arguing that (a) the FBI has in effect "cherry picked" the sample by removing its weakest exemption claims, and (b) the FBI has failed to adequately explain why it is now releasing information that it previously withheld. Pl.'s 2d Mem. at 1-7. While the Court is displeased with the course of conduct chosen by the FBI in this case, it nevertheless concludes that the sample remains valid and that no further reprocessing is required.

### i.    Both parties are at fault for the present posture of this case.

The Court begins with a more fulsome description of the relevant procedural history. Shortly after the Court's decision addressing the parties' first round of motions for summary judgment, the parties jointly submitted a proposed schedule for resolving the various outstanding issues identified by the Court. *See* Joint Status Report & Proposed Briefing Schedule, Docket No. [113]. Having had the opportunity to review the Court's decision, the FBI determined that "the best course of action" was to first reprocess the full universe of responsive documents in their entirety and to re-release the disclosable portions thereof to Schoenman. *Id.* at 2. Schoenman consented to this course of action and, by mutual agreement, the parties proposed that the FBI would complete its reprocessing efforts on or before June 30, 2009. *Id.* Thereafter, Schoenman would select a sample of approximately 10% of all responsive records to serve as the subject of a revised *Vaughn* index. *Id.* The parties would then meet and confer to review each document selected by Schoenman and address any misunderstandings. *Id.* at 4. Only thereafter would the parties file their renewed motions for summary judgment. *Id.*

The Court agreed with the proposed course of action and entered a schedule corresponding to the steps identified by the parties. Min. Order (Apr. 21, 2009). At first, the process proceeded as planned. On July 1, 2009, the FBI advised the Court that it had reprocessed all responsive records—a total of 3,987 pages—and had produced the disclosable parts thereof to Schoenman. Status Report, Docket No. [118], at 1. Schoenman subsequently selected slightly over 400 pages to serve as the representative sample and, on September 17, 2009, the parties advised the Court that they had met and conferred concerning the composition of the sample. *See* Joint Status Report, Docket No. [123], at 1. Both parties certified that they were "in

agreement with the list of pages selected by [Schoenman]." *Id.*

Unfortunately, things were not to be so simple. On November 13, 2009, the FBI advised the Court that it had "encountered administrative difficulties, largely unforseen, with respect to the preparation and the coding of the FBI's sample *Vaughn* declaration." Def.'s Unopposed Mot. for Enlargement of Time, Docket No. [130], at 1-2. The FBI did not identify those "difficulties" with particularity, nor suggest that it was anticipating supplementing its production to Schoenman. *Id.* Schoenman consented to, and the Court allowed, an extension of the briefing schedule to accommodate these issues. *Id.* at 4; Min. Order (Nov. 16, 2009). On January 13, 2010, on the eve of the relevant deadline, the FBI requested a further extension. Def.'s Unopposed Mot. for an Enlargement of Time, Docket No. [134]. The only basis for the requested extension was the illness of counsel; the FBI never suggested that it was anticipating supplementing its production to Schoenman. *Id.* Schoenman again consented to, and the Court allowed, the extension. *Id.* at 2; Min. Order (Jan. 14, 2010).

According to the FBI, in the course of preparing its Renewed Motion for Summary Judgment, its review of the sample records selected by Schoenman revealed that "additional material from those pages selected could be released." 6th Hardy Decl. ¶ 34. However, the FBI did not stop there, concluding that, in light of these discoveries, "a full re-review of the approximate total of 3,987 pages was necessary." *Id.* Therefore, without prior notification to the Court or Schoenman, the FBI proceeded upon a second reprocessing of the full universe of records responsive to Schoenman's requests. *Id.* On January 19, 2010, less than a week after it had last requested an extension of time from the Court, the FBI supplemented its production, re-releasing 2,983 of a total of 3,987 pages to Schoenman. *Id.* ¶ 34 & Ex. S. The FBI filed its

Renewed Motion for Summary Judgment a mere two days later.

With this procedural landscape set out, some observations are in order. On the one hand, the FBI should be commended for voluntarily conducting a complete, second review of all the records at issue once it discovered for itself that there were issues with a limited subset of its withholding decisions. Lest they endorse the ossification of unreasonable and indefensible litigation positions, courts should create an atmosphere encouraging of such proactive, voluntary efforts on the part of agencies. On the other hand, it is simply inexplicable that the FBI never alerted the Court of its intention to engage in a second reprocessing before it filed its Renewed Motion for Summary Judgment, especially since the FBI's was, in the same time period, actively seeking extensions of time to prepare that motion. The Court had set a schedule designed to secure the parties' agreement as to the precise composition of the representative sample to be used, and the FBI, on its own accord, decided to undermine that process. The FBI could have, and should have, secured Schoenman's consent and notified the Court so that it might adjust the schedule as it deemed necessary to preserve this design. The Court shall not belabor the point: the FBI is cautioned that it should refrain from such behavior in the future or suffer the consequences.

Nearly equally disturbing, however, is that Schoenman waited an extraordinary three months to raise the issue. After receiving the FBI's supplemental production and its Renewed Motion for Summary Judgment, Schoenman filed four separate requests for an extension of time to respond. *See* Pl.'s Unopposed Mot. for Extension [sic] of Time to Respond to the Federal Bureau of Investigation's Renewed Mot. for Partial Summ. J., Docket No. [136]; Pl.'s Unopposed Mot. for Extension of Time to Respond to the Federal Bureau of Investigation's

Renewed Mot. for Partial Summ. J., Docket No. [137]; Pl.'s Unopposed Mot. for One-Day Extension of Time to Respond to the Federal Bureau of Investigation's Renewed Mot. for Partial Summ. J., Docket No. [138]; Pl.'s Mot. for Leave to Bile [sic] Renewed Cross-Mot. for Summ. J. Out-of-time, Docket No. [139]. Not once in the course of making these four requests did Schoenman advise the Court that the FBI had unilaterally conducted a second reprocessing of the documents at issue, let alone suggest that this might be grounds for questioning the validity of the sample that he had selected and the parties certified. Nor did Schoenman otherwise raise the issue at any time in the nearly two months that elapsed between the FBI's supplemental production and the time he filed his opening papers responding to the FBI's Renewed Motion for Summary Judgment. Even then, Schoenman did not directly raise the argument he makes now—*i.e.*, that the FBI's decision to reprocess the records at issue a second time somehow vitiated the representativeness of the agreed-upon sample. *See generally* Pl.'s Mem. Instead, Schoenman only argued that the FBI's release of additional information suggested that there was an unacceptably high "error rate" in the FBI's processing procedures, *see* Pl.'s Mem. at 3-5; Lesar Decl. ¶¶ 1-3, an argument addressed elsewhere in this opinion, *see infra* Part III.A.2. It was not until Schoenman filed his reply papers, over three months after the FBI's supplemental production, that he first suggested that the FBI's second reprocessing efforts undermined the representativeness of the sample.[4] *See* Pl.'s 2d Mem. at 3-7. Like the FBI, Schoenman could have, and should have, brought the matter to the Court's attention months earlier.

---

[4] Ordinarily, the Court would disregard an argument raised for the first time in reply papers to which the opposing party has had no opportunity to respond. However, because the FBI arguably opened the door to the issue in its preceding memorandum, *see* Def.'s 2d Mem. at 5-7, the Court has, in an exercise of its discretion, decided to reach the merits of Schoenman's argument.

### ii. Schoenman's arguments do not cast doubt on the representativeness of the sample selected by the parties.

As evidenced by the foregoing account, both parties must bear some of the fault for where this action stands today, albeit perhaps to differing degrees. The question that remains, however, is what to make of the situation. On the one hand, both parties have at one time certified that they are in agreement with the sample selected by Schoenman. *See* Joint Status Report, Docket No. [123], at 1. On the other hand, Schoenman proffers two separate arguments as to why the FBI's second reprocessing efforts, occurring after the parties had already agreed to the composition of the sample, undermine the representativeness of the sample. Pl.'s 2d Mem. at 1-7. Schoenman first argues that the FBI has in effect "cherry picked" the sample by removing its weakest exemption claims from dispute. *Id.* at 6. He then argues that the FBI has failed to adequately explain why it released additional information that it had previously withheld. *Id.* at 7. Because the Court finds that neither argument undercuts the conclusion that the sample selected by the parties remains sufficiently representative of the larger universe of documents covered by Schoenman's requests, it concludes that a further reprocessing of the full universe of responsive documents is unwarranted in this case.

Schoenman's arguments might have some merit had the FBI, in course of preparing its Renewed Motion for Summary Judgment, discovered that there were issues with its withholding decisions as they pertained to the sample records, supplemented its production to release additional information only within the sample records, and gone no further. Critically, however, the FBI did not stop there, but proceeded to reprocess the entirety of the approximately 3,987 pages of responsive records a second time, ensuring that the full universe of records at issue in this action was processed according to the same standards and procedures. 6th Hardy Decl. ¶ 34.

As a result, there is nothing inherent in the FBI's second reprocessing efforts that would cast doubt on the representativeness of the sample selected by Schoenman and agreed upon by the parties.

Because the FBI's second reprocessing efforts extended across the board, Schoenman is misguided in relying upon authorities addressing the question of what happens when an agency restricts its reprocessing efforts to the representative sample alone. In such situations, unlike here, there is reason to suspect that the agency's limited reprocessing efforts have differentiated the sample from the larger universe of documents in such a way as to render the sample less "representative" of the group as a whole (and, more likely than not, in a way more favorable to the agency's position). Both of the authorities relied upon by Schoenman fall within this category.

Schoenman first cites to the decision of the United States Court of Appeals of the District of Columbia Circuit in *Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986). In that case, the district court examined the agency's 301-page sample *in camera*, a sample which included 75 pages of records that were released in an earlier phase of the litigation and reprocessed by the agency in order to determine whether withholding was appropriate. *Id.* at 956, 959. Notably, those 75 pages were merely representative of tens of thousands of pages of similar records falling outside of the sample; the agency did not reprocess the remaining tens of thousands of pages. *Id.* Based upon its limited reprocessing, the agency concluded that 19 of the 75 sample pages were improperly withheld—a conceded "error rate" of approximately 25%. *Id.* at 960. Considering this error rate alongside the district court's independent finding that the agency had been "intransigent" at the time that it conducted its first round of review, the Court of Appeals

considered it likely that many of the tens of thousands of pages falling outside the scope of the sample were also never appropriately processed and improperly withheld. *Id.* Clearly, there are various reasons why *Meeropol* is inapposite, not the least of which being that the FBI has never been found to have acted "intransigently" at any time in this action. However, the principal fault with Schoenman's attempt to draw a line between that situation and the present is that the FBI's reprocessing efforts in the instant case, in stark contrast to *Meeropol*, were not limited to the discrete sample selected by the parties, but rather extended to the complete universe of 3,987 pages responsive to Schoenman's requests. 6th Hardy Decl. ¶ 34 & Ex. S. There is therefore no reason to suspect that the FBI has voluntarily and strategically disclosed a type of information within the sample that might also be interspersed throughout the universe of responsive records and improperly withheld. To use Schoenman's chosen parlance, there is no indication that the FBI has somehow "cherry picked" the sample by removing from consideration its weakest exemption claims. Pl.'s 2d Mem. at 6.

Schoenman also misreads the decision of the Court of Appeals in *Bonner v. U.S. Dep't of State*, 928 F.2d 1148 (D.C. Cir. 1991). In that case, the parties agreed upon using a sample of 63 documents for purposes of testing the agency's exemption claims. *Id.* at 1149. However, when the agency furnished its *Vaughn* index, only 44 of the 63 sample documents were covered; the agency decided *sua sponte* to release the remaining 19 documents in full without explaining why it had changed its mind—a potential "error rate" of approximately 30%. *Id.* The Court of Appeals concluded that the district court erred by failing to consider the propriety of the agency's initial decision to withhold information from the 19 documents, providing that "[a] *Vaughn* index . . . for fully but recently released documents that are part of a representative sample, should

explain why the once withheld portions were excised at the time of the agency's initial review." *Id.* at 1152-53. It therefore remanded to the district court to assess the agency's initial decision to withhold information from the 19 documents and, from that, determine the error rate across the sample group of 63 documents. *Id.* at 1154. The rationale is plain: where an agency belatedly discloses information that is part of a representative sample (but does not similarly reprocess the larger universe of responsive records), it must provide the district court with a credible explanation as to why it has changed its mind; otherwise, the sensible conclusion to be drawn is that the agency erred and that it erred at the same rate across all responsive documents. No such explanation is required here for the simple reason that the FBI never limited its reprocessing efforts to the sample; as such, this Court is not tasked with determining whether the FBI's abandoned withholding decisions should be treated as erroneous and, if so, whether those errors should be imputed to the larger universe of responsive records.

The critical point here is that Schoenman's cited authorities both involved instances in which the agency, when faced with the prospect of justifying its withholding decisions as to a discrete set of sample documents, proceeded as follows: it reprocessed the discrete set of sample documents, it discovered unjustifiable withholdings within the sample set, and it elected to strategically disclose the indefensible information within the sample set. In neither instance did the agency, after uncovering a concerning incidence of errors, take the additional step—like the FBI did here—of proactively reprocessing not just the discrete set of sample documents, but also the full universe of responsive documents that were processed in the first instance according to the same, apparently defective, procedures and guidelines. In such a position, the agency must *either* (a) justify its belated production of information within the sample set in such a way that

permits the district court to conclude that the sample nevertheless remains sufficiently sound such that conclusions may be extrapolated from the sample to the larger universe of withheld materials, *or* (b) reprocess the entire universe of documents at issue so that the court may conclude that the sample is representative of the larger universe of responsive documents as a whole—to, in effect, start with a clean slate. The FBI opted for the latter path and, although the better practice certainly would have involved notifying the Court and Schoenman before proceeding down this path, the fact that it failed to do so does not undermine the conclusion that the sample selected by the parties remains representative.

Viewed from a slightly different perspective, Schoenman's arguments must fail for the fundamental reason that he has already received all the relief to which he might hypothetically have been entitled as a result of any errors in the FBI's first reprocessing efforts. Critically, in each of the authorities cited by Schoenman, the only contemplated relief was a further reprocessing of the broader universe of the records at issue, such that would realign the sample with the whole. *See Meeropol*, 790 F.2d at 960; *Bonner*, 928 F.2d at 1154. Therefore, even assuming, *arguendo*, that the FBI released additional information as a result of errors in its first reprocessing efforts (as opposed to, for example, the application of an intervening change in law favoring more liberal disclosure), the FBI voluntarily reprocessed all the records at issue in this action a second time. 6th Hardy Decl. ¶ 34 & Ex. S. This renders Schoenman's argument, in effect, moot.

In the end, Schoenman has proffered no argument that would undercut the conclusion that the sample agreed upon by the parties is sufficiently representative of the larger universe of records at issue in this case. The Court underscores that, in the many months since the FBI first

served its supplemental production, Schoenman has never suggested that he would have selected a different set of records to comprise the sample had the FBI completed its second reprocessing earlier in time, let alone specifically identified what other documents he might include or articulated how the FBI's supplemental production could meaningfully alter the sample to be selected. Schoenman has tendered only two basic arguments in favor of requiring a further reprocessing of the records at issue in this action and, for the reasons just described, each argument is without merit. The record simply does not support the conclusion that the sample today is any less representative than it was when it was first selected by Schoenman and certified by the parties. Accordingly, the Court concludes that a further reprocessing of the larger universe of records responsive to Schoenman's requests is not warranted on this basis.

### 2. Further Reprocessing Is Not Warranted Based Upon the Alleged "Error Rate" in the Sample

Separately, Schoenman contends that the "error rate" in the sample is so "unacceptably high" as to require a further reprocessing of all the records responsive to his various requests.[5] Pl.'s Mem. at 2-5; Pl.'s 2d Mem. at 7. From the 402 pages that comprise the sample set, Schoenman subtracts various cover sheets and placeholders representing documents that have been withheld, misplaced, or referred to other agencies. Pl.'s Mem. at 2. After a series of calculations, Schoenman asserts that 25% of the pages in the sample "contain additional information" that was only produced after the FBI reprocessed the records at issue a second time,

---

[5] This argument is in some tension with Schoenman's contention that the sample is invalid by virtue of the FBI's supplemental production, as it proceeds upon the assumption—never acknowledged by Schoenman—that the sample *is* sufficiently representative such that the Court could extrapolate the "error rate" from the sample to the larger universe of responsive records. The tension is ultimately of no moment, as the Court has concluded that the sample is indeed representative.

paints this as the "error rate" in the FBI's reprocessing efforts, and avers that this alone "requires that all records be reprocessed." *Id.* at 3. Schoenman's characterization of the purported "error rate" is not persuasive. Simply put, his calculations are inaccurate and misleading, and his argument again ignores the fact that the FBI has already reprocessed all the records at issue.

True, after reprocessing the records at issue in this action a second time, the FBI released additional information previously withheld from a total of approximately 52 pages that were included in the sample selected by Schoenman. 6th Hardy Decl. ¶ 36 n.6 & n.7. But even assuming, *arguendo*, that all 52 pages with additional releases were the result of errors in the FBI's earlier processing efforts, the "error rate," as that term is used by Schoenman, is at most 12.9%.[6] This figure falls considerably short of the 25% error rate described as "unacceptably high" by the United States Court of Appeals for the District of Columbia Circuit. *See Meeropol*, 790 F.2d at 960. Schoenman has cited no authority within this Circuit, and the Court is aware of none, providing that a 12.9% error rate within the representative sample is sufficient to trigger a duty on the agency's part to reprocess all responsive records.

While the Court is not entirely convinced that an "error rate" within the range presented in the instant case exceeds the level of acceptable error, the Court ultimately need not reach the issue, for the simple reason that this figure is not the relevant "error rate" at all. If anything,

---

[6] The Court agrees with the FBI that the proper denominator in determining what Schoenman characterizes as the "error rate" would be the total number of pages in the sample selected and not, as Schoenman suggests, the number of pages in the sample after subtracting pages that have been withheld in full, misplaced, or referred to other agencies. The reasons are simple. First, Schoenman was the architect of the sample; he affirmatively selected the pages that would be included and he cannot now be heard to complain as to the sample's composition. Second, and more to the point, there is no indication that the FBI ever "erred" in its treatment of these records.

these alleged errors occurred in the context of the FBI's *first* reprocessing of the records at issue, and simply have no bearing upon the soundness of the FBI's *second* reprocessing efforts. There is no evidence in the record, and Schoenman has certainly not pointed to any, that would suggest that there is a meaningful incidence of errors in the second reprocessing. Indeed, Schoenman appears to concede as much by suggesting that "it is not possible" to determine whether a comparable error rate infused the FBI's second reprocessing efforts. Pl.'s 2d Mem. at 7. In any event, as was the case before, Schoenman's argument must fail because he received all the relief to which he might hypothetically have been entitled when the FBI decided to voluntarily undertake a second and complete reprocessing of all the records at issue in this action. 6th Hardy Decl. ¶ 34. By eschewing a reprocessing effort that would be limited to the sample records, the FBI maintained the alignment between the sample and the larger universe of responsive documents, *see Meeropol*, 790 F.2d at 960; *Bonner*, 928 F.2d at 1154, and therefore a further reprocessing of the records at issue in this action is unwarranted.

### B.       The FBI Has Discharged its Burden of Preparing an Adequate **Vaughn** *Index*

In the FOIA context, it is now well-established that the district court may award summary judgment to an agency solely on information provided in affidavits or declarations, provided that the agency's submissions: set forth a "relatively detailed" justification for invoking an exemption to disclosure; specifically identify the reasons why a particular exemption is relevant; and correlate those claims with those records (or portions thereof) to which they apply. *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006). The import of such submissions, often loosely referred to as "*Vaughn* indices" is clear: absent some mechanism for ensuring that the agency sustains it action, "[t]he agency would . . . have a nearly impregnable

defensive position." *Id.* at 146. Viewed in this way, the *Vaughn* index helps restore, to the extent possible, the normal adversarial balance in litigation by forcing the agency to carefully analyze any information withheld, empowering the requester to present its case to the district court, and enabling the district court to fulfill its duty of evaluating the applicability of claimed exemptions. *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987). The current iteration of the FBI's *Vaughn* index, which in 82 pages provides a comprehensive and detailed description of each of the documents at issue and the bases for invoking specific exemptions to disclosure, achieves each of these salutary purposes and conforms to the relevant legal standard.[7] By providing a complete description of, and justification for, the information withheld, the FBI's submissions accord with the statutory requirements imposed by FOIA and the requirements of *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), and its progeny.

With these general observations aside, the Court does not begin with a blank slate in this case. Indeed, when it had the opportunity to address the parties' first round of cross-motions for summary judgment, the Court characterized the previous iteration of the FBI's *Vaughn* index, which was spread over five separate documents, as "utterly inadequate." *Schoenman*, 604 F. Supp. 2d at 195. The infirmities in that submission were numerous and included: the failure to provide a single, comprehensive index; the failure to account for all records that Schoenman selected for inclusion in the sample; the failure to provide a functional description of the materials withheld in their entirety; the failure to provide sufficient context where information was withheld in part; the failure to adequately explain the bases for withholdings; and the failure

---

[7] In addition to the index itself, the FBI has also included with its submissions redacted versions of documents withheld only in part, which provide further context in evaluating the propriety of any partial withholdings. 6th Hardy Decl. Ex. A.

to explain various mistakes and inconsistencies.  *Id.* at 195-202.  Based upon this litany of infirmities in the FBI's submission, the Court directed the FBI to prepare a single, comprehensive *Vaughn* index "adequately describ[ing] the withheld documents or deletions, . . . stat[ing] the particular FOIA exemption, and explain[ing] why the exemption applies."  *Id.* at 202.

Schoenman, for his part, does not dispute that the FBI has provided a single, comprehensive index, but rather challenges the adequacy of the FBI's *Vaughn* index on three grounds previously addressed by the Court: first, he suggests that the FBI has failed to account for all the records that he selected for inclusion in the sample; second he contends that the FBI has failed to provide a sufficiently particularized description of the information withheld and the bases for non-disclosure; and third, he argues that a handful of "inconsistencies" in the *Vaughn* index undermine the overall credibility of the FBI's factual showing.  The Court addresses each argument in turn, with the ultimate conclusion that the FBI has remedied the infirmities in its prior submissions and otherwise complied with the applicable legal standard.

### 1. The FBI Has Adequately Accounted for All the Records Selected for Inclusion in the Sample

Schoenman first asserts that the FBI's *Vaughn* index is insufficient because it fails to account for the entirety of sample selected by the parties.  Pl.'s Mem. at 2-3.  He is mistaken. The sample selected by Schoenman and agreed upon by the parties consists of a total of 402 pages.  6th Hardy Decl. ¶ 36.  Out of these 402 pages, the FBI produced to Schoenman a total of 290 physical pages.[8]  *Id.* Ex. A.  Despite Schoenman's apparent belief to the contrary, these 290

---

[8]  Both Schoenman and the FBI state that the number of pages is 291, a number which apparently includes the cover page to the exhibit accompanying the FBI's Renewed Motion for Summary Judgment.  Pl.'s Mem. at 5; Def.'s 2d Mem. at 3.  By the Court's count, the total number of pages is actually 290.  6th Hardy Decl. Ex. A.  The difference, however, is immaterial.

pages account for all 402 pages of the sample set, for the simple reason that they include various single-page cover pages and placeholders for multi-page documents withheld in full, misplaced, or referred to other agencies. *Id.* ¶ 36 & Ex. A. Simply by way of example, one such document, designated S2380-2388, is a single-page "deleted page information sheet" (commonly referred to as a "delete sheet") indicating that the FBI withheld a document in full at that point in the production and providing the Bates-numbering for the withheld document. *Id.* Ex. A at 196. The FBI's *Vaughn* index, in turn, explains that a total of nine pages—a letter and attachment from a foreign government dated November 3, 1966—were withheld at this point in the production based on various exemptions. *Id.* ¶ 36. When one takes into consideration all such placeholders, the FBI has accounted for the disposition of the entirety of the 402-page sample selected by Schoenman and certified by the parties.

As a variation on the same theme, Schoenman next asserts that the FBI has failed to account for various documents referred to other agencies for further processing. Pl.'s Mem. at 18-20. Citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), he contends that the FBI is required to provide a "complete inventory" of such referrals. Pl.'s Mem. at 20. What Schoenman means by the phrase "complete inventory" is far from clear from his papers. To the extent he means that the FBI must indicate if and when responsive documents are referred to another agency for further processing, and the number of pages referred, the record is clear that the FBI has in fact done so. 6th Hardy Decl. ¶¶ 5-19 & Exs. B-P, S. To the extent Schoenman means that the FBI is obligated to itemize and specifically identify such documents, the FBI rejoins, accurately, that it has accounted for all records included within the sample that were referred to other agencies. *Id.* ¶ 36. Schoenman never contests this in his reply papers, but

instead asserts in cursory fashion that the FBI is "flouting the principle" that an agency must account for all responsive records by failing to itemize records *not* included in the sample selected. Pl.'s 2d Mem. at 22. Quite the contrary, it is Schoenman who contravenes the parties' agreement (endorsed by this Court on more than one occasion) to proceed with an agreed-upon sample of records as the relevant universe for the parties' respective cross-motions for summary judgment. *See* Joint Status Report, Docket No. [113]; Joint Status Report, Docket No. [118]; Min. Order (Apr. 21, 2009); Min. Order (July 30, 2009). Schoenman selected the sample in the first instance; thereafter, the parties met and conferred and certified that they were both in agreement as to the composition of the sample. *See* Joint Status Report, Docket No. [123]. As the United States Court of Appeals for the District of Columbia Circuit has recognized on more than one occasion, "[r]epresentative sampling is an appropriate procedure to test an agency's FOIA claims when a large number of documents are involved," because it "allows the court and the parties to reduce a voluminous FOIA exemption case to a manageable number of items." *Bonner*, 928 F.2d at 1151. Schoenman cannot now be heard to complain that the FBI has not included documents in the *Vaughn* index that he affirmatively chose to exclude from the sample.

### 2. The FBI's *Vaughn* Index Adequately Describes the Information Withheld and the Bases for Non-Disclosure

Schoenman next asserts that the FBI's *Vaughn* index does not adequately describe the records comprising the sample and sometimes claims multiple exemptions without correlating those exemptions to the information withheld. Pl.'s Mem. at 7-8; Pl.'s 2d Mem. at 13. Schoenman's objections are without merit.

As an initial matter, Schoenman has failed to identify such alleged deficiencies with any measure of specificity, rendering it impossible for the FBI to provide a meaningful response. In

his opening papers, Schoenman asserted—in a broad and unilluminating fashion—that the FBI's *Vaughn* index failed to adequately describe an unspecified universe of records withheld in full or in part. Pl.'s Mem. at 7. But Schoenman offered only a single example of this alleged infirmity—namely, a document Bates-stamped S1785-1786. *Id.* Despite Schoenman's contention to the contrary, the FBI has identified this document with more than sufficient specificity and has provided a reasonably detailed justification for its non-disclosure. The FBI's sworn declarations identify the date this document was created, describe its contents, state the exemptions relied upon for the withholdings therein, and explain why the exemptions are relevant. 6th Hardy Decl. ¶¶ 36, 42. Altogether, these descriptions paint a rather comprehensive picture of S1785-86: the document is a three-page translation of notes sent from the FBI's Paris office to FBI headquarters dated January 7, 1969 and contains information provided by foreign law enforcement authorities under an express assurance of confidentiality, sets forth classified information about the intelligence components of a foreign government, and identifies FBI personnel or individuals merely mentioned in passing. *Id.* ¶¶ 36, 42, 48, 55, 98, 102, 115. Simply put, the FBI's description more than suffices to discharge its burden of providing a reasonably detailed description of the document and the proffered justification for non-disclosure.

Nor is the FBI's factual showing limited to this document alone, but rather extends across the board, covering each of the documents included in the sample agreed upon by the parties. Significant in this regard, Schoenman attached to his reply papers a list of 29 documents comprising a total of 43 pages withheld in full that he contends are not described with sufficient

particularity.[9]  Pl.'s Suppl. 2d Mem. Ex 1.  However, because he first identified these records and

raised the question of the sufficiency of the FBI's descriptions as to them in his reply papers,[10] to

which the FBI had no opportunity to respond, the Court shall disregard this facet of Schoenman's

argument.  Even if the Court were inclined to reach the merits of the argument, Schoenman is

simply mistaken that the FBI has failed to present a reasonably detailed description of these 29

documents and the proffered justifications for non-disclosure.  As before, the FBI has, for each

document, provided the date the document was created, described its contents, identified the

exemptions relied upon for the withholdings therein, and explained why the exemptions are

relevant.  6th Hardy Decl. ¶¶ 36, 42.  The FBI has discharged its burden.

In truth, Schoenman does not appear to actually consider these documents to be

fundamentally different from the other 359 pages that comprise the sample agreed upon by the

parties.  Rather, Schoenman's objections reduce to little more than a disagreement as to the FBI's

decision to identify each document individually and then situate the document within one or

more of sixteen categories corresponding to the nature of the information at issue and the

proffered justification for non-disclosure.  *Id.*  While Schoenman may understandably disagree

with this approach, the case law is clear: an agency is not precluded from grouping categories of

documents that merit similar treatment when preparing its *Vaughn* index.  *Budik v. Dep't of

Army*, __ F. Supp. 2d __, 2010 WL 3833828, at *12 (D.D.C. Sept. 30, 2010).  In fact, where, as

---

[9]  Schoenman erroneously identifies one of these documents as S3625, when the context makes it clear that he is actually referring to S3626.  Pl.'s Suppl. 2d Mem. Ex. 1.

[10]  Strictly speaking, Schoenman did not even include an accurate list of these documents in his reply papers, but rather filed a supplemental memorandum with a revised list out of time and without first seeking the Court's leave.  Pl.'s Suppl. 2d Mem. Ex. 1.

here, abstraction is used properly, it may actually assist the district court in reviewing the agency's actions. *Judicial Watch*, 449 F.3d at 147. The essential point is that the FBI has, in this case, justified its withholding decisions through commonalities, not generalities, and explained why the exemptions claimed apply to a given document (or type of document) while affording due attention to the contents of the withheld information. *Id.*; *see also Keys*, 830 F.2d at 349-50 (agency situated each document into its historical context and adequately explained exemptions through use of "functional categories"); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) ("The source, subject matter, and nature of each document were described separately, and although not individually stated for each document, it is clear from the nature of the documents and the single exemption asserted which justifications apply to which documents."). Accordingly, Schoenman's contentions do not undermine the Court's conclusion that the FBI's *Vaughn* index conforms to the applicable legal standard.

### 3. Schoenman's Allegations of "Inconsistencies" in the FBI's *Vaughn* Index Do Not Undermine the FBI's Factual Showing

Finally, Schoenman asserts that the FBI should be required to reprocess all the records responsive to his various requests due to a handful of alleged "inconsistencies" in the FBI's treatment of records. Pl.'s Mem. at 8-10; Pl.'s 2d Mem. at 13-18. With minimal explication and little, if any, attempt to articulate a logical connection between what he views as inconsistencies and the overall validity of the FBI's *Vaughn* index and withholding decisions, Schoenman rattles off a series of such alleged "inconsistencies"—a total of seven—and posits that they fundamentally "undermine the credibility" of the FBI's sworn declarations. Pl.'s Mem. at 10. For at least three reasons, he is mistaken. First, after conducting a searching review of the FBI's *Vaughn* index and the record as a whole, the Court can discern no clear inconsistencies in the

27

FBI's treatment of the records identified by Schoenman. Second, even if this were not the case, where, as here, the agency processes thousands of pages of records in response to requests, it is beyond cavil that "minor inconsistencies are unsurprising and practically inevitable." *Clemente v. Fed. Bureau of Investigation*, __ F. Supp. 2d __, 2010 WL 3832047, at *19 (D.D.C. Sept. 28, 2010). All of the "inconsistencies" identified by Schoenman, to the extent they can even be characterized as such, are the sort of "minor ambiguities" that the United States Court of Appeals for the District of Columbia Circuit has described as "undeserving of extended treatment." *SafeCard Servs., Inc. v. Secs. & Exch. Comm'n*, 926 F.2d 1197, 1202 (D.C. Cir. 1991); *cf. Armstrong v. Executive Office of President*, 97 F.3d 575, 580 (D.C. Cir. 1996) (intimating that the rationale provided for the exemption must be "clearly inconsistent" with other disclosure decisions to require more searching judicial review). Third, and finally, because the FBI has provided a "plausible justification for such withholdings," *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 394 (D.C. Cir. 1987), "[t]he Court is unpersuaded that [the alleged] inconsistencies undermine the FBI's credibility at all, let alone so thoroughly that the agency's exemption claims must be rejected," *Clemente*, 2010 WL 3832047, at *19.[11]

---

[11] In his reply papers, Schoenman also purports to describe additional "inconsistencies" allegedly scattered throughout the FBI's production. Pl.'s 2d Mem. at 16-18. Because Schoenman identified these "inconsistencies" for the first time in his reply papers, to which the FBI had no opportunity to respond, and because they indisputably fall outside the scope of the sample that was expressly designed to be the parties' exclusive focus for purposes of their respective cross-motions for summary judgment, the Court shall disregard this facet of Schoenman's argument. Even if the Court were inclined to reach the merits of Schoenman's argument, the Court's review of Schoenman's allegations similarly reveals that these "inconsistencies" are, at best, the sort of "minor ambiguities" that are insufficient to cast doubt on the FBI's factual showing. *SafeCard Servs.*, 926 F.2d at 1202.

### C.    The FBI Has Justified its Invocation of Various Exemptions to Disclosure

Where an agency invokes an exemption to disclosure, "it bears the burden of establishing the applicability of the claimed exemption," *Assassination Archives*, 334 F.3d at 57, and its justification must be "logical" or "plausible," *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  With these principles in mind, the Court now addresses the propriety of the FBI's withholding decisions challenged by Schoenman.[12]

### 1.    The FBI Has Properly Invoked Exemption 1

Exemption 1 permits an agency to withhold "matters" from disclosure if such matters are (a) "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," and (b) "are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  Here, the FBI relies on Executive Order 12,958, as amended ("EO 12,958").  *See* Executive Order 13,292, 68 Fed. Reg. 15315 (Mar. 25, 2003).[13]  While the standard of review is *de novo*, where, as here, the records at issue implicate national security interests, the district court must accord substantial weight and deference to the agency's

---

[12]  Schoenman has never disputed the FBI's reliance on Exemption 3, which authorizes agencies to withhold information "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  In this case, the FBI has withheld certain information pursuant to the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 403(g), and the National Security Act of 1947, as amended, 50 U.S.C. § 403-1(i)(l).  6th Hardy Decl. ¶¶ 87-90.  In addition, while Schoenman's requests originally cited the Privacy Act as a basis for disclosure, Schoenman never responds to the FBI's argument that, because the records at issue were compiled by a criminal law enforcement component of the United States Department of Justice, they are categorically exempt from disclosure under the Privacy Act.  Def.'s Mem. at 6 n.6.  The Court shall therefore treat both arguments as conceded.  *See Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009) (where party fails to respond to arguments in opposition papers, the district court may treat them as conceded) (citing *Fed. Deposit Ins. Co. v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997)).

[13]  EO 12,958 has since been superseded.  *See* Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).

assessment of the harm to foreign relations or national security that would result from officially disclosing the information at issue. *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 766 (D.C. Cir. 1990). In recognition of the Executive's "far greater resources and aptitude" in such matters, and the federal courts' customary policy of according deference to the Executive in matters of foreign affairs, district courts must refrain from "substitut[ing] their own policy judgments for those of the [E]xecutive." *Ameziane v. Obama*, 620 F.3d 1, 7 (D.C. Cir. 2010). In short, in the national security context, the agency's burden is "a light one" and it is unwise to undertake searching judicial review. *Am. Civil Liberties Union v. U.S. Dep't of Def.*, __ F.3d __, 2011 WL 192498, at *8 (D.C. Cir. Jan. 18, 2011). Therefore, to establish that information falls within the scope of EO 12,958, "little proof or explanation is required beyond a plausible assertion that [such] information is properly classified." *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

In this case, the FBI has provided a reasonably detailed and non-conclusory description of its procedural and substantive compliance with EO 12,958. The FBI's sworn declarations begin, in relevant part, by accurately providing that information may be classified pursuant to EO 12,958 only if all of the following conditions are met: the original classification authority is classifying the information; the information is owned by, produced by or for, or is under the control of the United States; the information falls under one or more of several enumerated categories; and the original classification authority determines that the unauthorized disclosure of the information could be expected to result in damage to national security and the original classification authority is able to identify or describe the damage. 6th Hardy Decl. ¶ 45. The FBI proceeds to explain, in considerable detail, precisely how the process it employed in determining

whether the records responsive to Schoenman's requests accorded with these procedural requirements. First, an individual with original classification and declassification authority reviewed each of the records at issue in this action and determined that the records were owned by, produced by or for, or were under the control of the United States. *Id.* ¶¶ 47-48. Second, the FBI determined that specific records contained "foreign government information" or information pertaining to "intelligence sources or methods," *id.* ¶ 48—two of the enumerated categories of information. Third, the FBI determined in each instance that the unauthorized disclosure of such information could reasonably be expected to cause damage or serious damage to national security interests or foreign relations, and, as a result, the records at issue were designated as either "confidential" or "secret." *Id.* ¶ 47. Finally, the FBI describes how the other requirements imposed by EO 12,958 were satisfied in the instant case: each record was properly marked; no information was withheld for an improper purpose; the relevant declassification policies were followed; and all reasonably segregable portions of the records at issue were declassified and marked for release unless withholding was otherwise warranted. *Id.*

From this procedural base, the FBI proceeds to demonstrate—again, in a reasonably detailed and non-conclusory manner—that each item of information withheld pursuant to Exemption 1 falls within at least one of the categories enumerated within EO 12,958—in particular, "foreign government information" and/or "intelligence sources or methods." EO 12,958 § 1.4(b)-(c). Throughout, the FBI identifies with particularity which portions of which records were withheld and on what basis; however, for purposes of economy and clarity, the Court shall refer to broader categories of information.

In the first category, the FBI withheld: information identifying intelligence components of

a specific foreign government and information provided by them to the FBI; the identities of nine specific foreign government components; and communications received from nine foreign government intelligence components and designated as classified by the foreign government. 6th Hardy Decl. ¶¶ 36, 42, 55, 57, 59. The FBI plausibly explains, in reasonable detail and a non-conclusory manner, how, even after accounting for the passage of time, the disclosure of such information would violate an express understanding that such information would remain classified, could reasonably be expected to strain foreign relations, could have a chilling effect on the free flow of vital intelligence information, and cause serious damage to national security and the war on the terrorism. *Id.* ¶¶ 56, 58, 60.

In the second category, the FBI withheld: intelligence source identifiers; detailed intelligence source information; and intelligence activities and methods. *Id.* ¶¶ 36, 42, 66, 69, 71, 74. Again, the FBI plausibly explains, in reasonable detail and a non-conclusory manner, how, even after accounting for the passage of time, the disclosure of such information could reasonably be expected to endanger or have a chilling effect upon former and current intelligence sources, discourage cooperation, hamper the agency's law enforcement efforts, aid hostile entities in developing intelligence countermeasures, and strain foreign relations. *Id.* ¶¶ 63-64, 68, 70, 73, 75-76, 78.

Simply put, these descriptions meet and exceed the FBI's *de minimis* burden of establishing that each item of information withheld falls within the scope of EO 12,958, *Morley*, 508 F.3d at 1124, and, accordingly, the FBI's assessment is entitled to substantial weight and deference, *Fitzgibbon*, 911 F.2d at 766. While numerous, Schoenman's arguments to the contrary "simply do[] not outweigh the [g]overnment's 'assessment of the harm to foreign

relations and national security that would result from officially disclosing' the information."
*Alsawam v. Obama*, __ F. Supp. 2d __, 2011 WL 316232, at *6 (D.D.C. Jan. 18, 2011) (internal
quotation marks omitted). First, Schoenman's contention that the FBI has released other material
that was formerly classified, even if true, is neither indicative of bad faith nor sufficient to
overcome the substantial weight and deference owed to the FBI's determination as to the harm
that would flow from disclosure of the information withheld. To the extent Schoenman intends
to suggest that, by disclosing some unspecified universe of related information, the FBI has
waived the right to maintain its current classification designations, he has failed to establish, as
he must, that the information now requested is "as specific as" and "match[es] the information
previously disclosed." *Fizgibbon*, 911 F.2d at 765. Second, Schoenman's argument that the
passage of time has rendered the FBI's classification claims questionable constitutes nothing
more than a disagreement, however understandable, as to the FBI's assessment of the harms
associated with disclosure. The applicable legal standard, however, is clear and "allocates to the
[g]overnment the responsibility for evaluating the harms associated with public disclosure, and
neither the proponent of disclosure nor the district court is free to substitute its own policy
judgments for those of the Executive." *Alsawam*, 2011 WL 316232, at *6 (internal quotation
marks omitted). Moreover, as this Court said when it last rejected this same argument in this
action, "the passage of time alone is not enough to discredit an otherwise detailed and persuasive
affidavit," *Schoenman v. Fed. Bureau of Investigation*, 04 Civ. 2202 (CKK), 2009 WL 763065,
at *21 (D.D.C. Mar. 19, 2009) (internal quotation marks and notations omitted), and Schoenman
has presented no competent evidence casting doubt on the FBI's sworn declarations in this
action. Third, and finally, Schoenman's suggestion that the FBI's determinations as to the harms

associated with disclosure presume that harm will occur or are designed to conceal illicit conduct are speculative, unsupported, and contradicted by all the competent evidence in the record—it is, in short, without merit. For these reasons, the Court concludes that the FBI has properly invoked Exemption 1 in this action.

### 2. The FBI Has Properly Invoked Exemption 2

Exemption 2 permits an agency to withhold from disclosure information "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The exemption protects, *inter alia*, information created for "predominantly internal purposes," which either pertains to "trivial administrative matters" of no genuine public interest or which would significantly risk circumvention of a legal requirement if publicly disclosed. *Schiller v. Nat'l Labor Relations Bd.*, 964 F.2d 1205, 1207 (D.C. Cir. 1992). In this case, the FBI relies upon Exemption 2 to justify the non-disclosure of confidential source symbol numbers and confidential source file numbers. 6th Hardy Decl. ¶¶ 36, 42. As explained in exhaustive detail in the FBI's sworn declarations, these confidential source identifiers are internal administrative tools used to protect the identity of confidential sources and to facilitate the exchange of information provided by such sources. *Id.* ¶¶ 82, 84. The FBI has a long-standing policy of redacting confidential source identifiers prior to disclosing records, and "vigorously protect[s]" such information because disclosure would not only violate the assurance of confidentiality promised to those sources but could also endanger the lives of those sources and their families and associates. 7th Hardy Decl. ¶¶ 5-6. In addition, because such information may reveal the scope of the FBI's informant coverage within a particular geographic area and could compromise the identity of sources, its public disclosure would impede the FBI's effectiveness in gathering

confidential information. 6th Hardy Decl. ¶¶ 83, 85-86. Accordingly, such information is appropriately withheld pursuant to Exemption 2. *See Lesar v. U.S. Dep't of* Justice, 636 F.2d 472, 485 (D.C. Cir. 1980) ("The means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest."); *Fischer v. U.S. Dep't of Justice*, 596 F. Supp. 2d 34, 45 (D.D.C. 2009) (non-disclosure of confidential source identifiers is justified under Exemption 2 because disclosure "could compromise the FBI's use of informants"). Schoenman's arguments to the contrary, nearly all of which are abandoned in his reply,[14] are completely without merit and contradict the long-settled jurisprudence of this Circuit.

### 3.     The FBI Has Properly Invoked Exemption 7

Exemption 7 authorizes an agency to withhold from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure of such records could result in one of six enumerated harms. 5 U.S.C. § 552(b)(7). The inquiry therefore divides into two: (a) the agency must first make the threshold showing that the records at issue were compiled for law enforcement purposes; (b) the agency must then establish that the information falls within the ambit of one of the six harms contemplated by the provision. *Clemente*, 2010 WL 3832047, at *15. The Court shall begin by explaining why the FBI has shown that the records at issue were compiled for "law enforcement purposes," thereafter turning to the question of whether the two enumerated harms associated with disclosure identified by the FBI apply in

---

[14] The only argument maintained by Schoenman in his reply papers is his repeated assertion that "the FBI does disclose permanent source symbol numbers on occasion," Pl.'s 2d Mem. at 28-29, an argument the Court addresses, and rejects, elsewhere. *See infra* Part III.C.3.iii.

the instant case.

### i. The FBI has shown that the records in question were compiled for law enforcement purposes.

To establish that records have been compiled for "law enforcement purposes," 5 U.S.C. § 552(b)(7), criminal law enforcement agencies or their components—such as the FBI—must show that the records at issue were compiled for a purpose related to the enforcement of federal law and that the enforcement activity is within the law enforcement responsibilities of that agency. *Keys*, 830 F.2d at 340. The relationship, or nexus, between the agency's activity and its law enforcement responsibilities need only be based on a "colorable claim of its rationality," *id.* (internal quotation marks omitted), which can be refuted only by "persuasive evidence that in fact another, nonqualifying reason prompted the investigation," *Shaw v. Fed. Bureau of Investigation*, 749 F.2d 58, 63 (D.C. Cir. 1983). In recognition of the fact "the FBI specializes in law enforcement, its decision to invoke [E]xemption 7 is entitled to deference." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998).

The FBI has satisfied its burden of demonstrating that it compiled the records at issue pursuant to an objectively reasonable law enforcement purpose. As described in its sworn declarations, the FBI's law enforcement activities at one time involved investigating "suspected threats to national security" within the anti-war movement of the 1960's, as well as suspected "communist agents of unrest," including Schoenman. 6th Hardy Decl. ¶¶ 92-93. The FBI identifies the Smith Act of 1940, 18 U.S.C. § 2385, the Voorhis Act, *id.* § 2387, and the Internal Security Act of 1950, 50 U.S.C. § 781, as the statutory authority for these law enforcement

activities.[15]  6th Hardy Decl. ¶ 93.  In this case, the FBI avers that all the records withheld on this

basis were compiled by the FBI as part of an "internal security" investigation of Schoenman and

various third parties.  *Id.* ¶ 92.  These representations—which are plainly consistent with, and

supported by, the information contained in the records released in part, *see id.* Ex. A—suffice to

establish a rational relationship between the FBI's law enforcement responsibilities and the

records withheld on this basis.  *See Concepcion v. Fed. Bureau of Investigation*, 606 F. Supp. 2d

14, 36-37 (D.D.C. 2009).  Schoenman's unsupported rejoinder that the records were actually

compiled as part of a pattern of "illegal surveillance of his lawful, public free speech activities,"

Pl.'s 2d Mem. at 30, falls woefully short of the sort of "persuasive evidence" that a non-

qualifying reason prompted the investigation that is required to overcome the FBI's showing,

*Shaw*, 749 F.2d at 63.  There simply is no competent evidence in the record that the materials at

issue here were compiled for any purpose other than that supplied by the FBI.  Accordingly, the

FBI has met its threshold burden of establishing that the records withheld under Exemption 7

were compiled for "law enforcement purposes."  5 U.S.C. § 552(b)(7).

## ii.        The FBI has properly invoked Exemption 7(C).

In enacting FOIA, Congress "underst[ood] that disclosure of records containing personal

---

[15]  With no meaningful explication, Schoenman questions in particular the FBI's reliance
on the Smith Act of 1940, 18 U.S.C. § 2385, suggesting that the last prosecution under that
statute occurred in 1956, before the records at issue in this action were created.  Pl.'s 2d Mem. at
29.  The import of the allegation is not entirely clear, given that Schoenman does not provide any
grounds for doubting the FBI's reliance on the Voorhis Act, 18 U.S.C. § 2387, or the Internal
Security Act of 1950, 50 U.S.C. § 781, which independently support the FBI's invocation of
Exemption 7.  Moreover, even crediting Schoenman's allegations, the mere fact that an
investigation may have been fruitless—in the sense that it did not lead to a successful
prosecution—does not ineluctably lead to the conclusion that records compiled in the course of
that investigation were not gathered for "law enforcement purposes."  5 U.S.C. § 552(b)(7).

details about private citizens can infringe significant privacy interests." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 766 (1989). As a direct outgrowth of this concern, Congress crafted Exemption 7(C), which permits agencies to withhold from disclosure records compiled for law enforcement purposes if the disclosure of such records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In assessing an agency's claim under Exemption 7(C), the district court must look to the balance of the privacy interests asserted and the public interest in disclosure, *Voinche v. Fed. Bureau of Investigation*, 412 F. Supp. 2d 60, 68 (D.D.C. 2006), and, as a general matter, the identification of an individual "in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation," *Branch v. Fed. Bureau of Investigation*, 658 F. Supp. 204, 209 (D.D.C. 1987). Therefore, "[a]bsent exceptional circumstances, the balance [of interests] categorically favors withholding the names . . . of third parties," as such information is not probative of an agency's performance of its statutory responsibilities. *Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000). In the end, the agency "need only show a reasonable likelihood of unwarranted invasion of personal privacy," *Voinche*, 412 F. Supp. 2d at 68, and the FBI has done so here.

In this case, the FBI has invoked Exemption 7(C) to withhold names or other identifying information for six basic categories of individuals: FBI agents and support personnel; non-FBI federal government personnel; local or foreign law enforcement personnel; third parties of investigative interest; third parties who provided information to the FBI; and third parties

incidentally mentioned.[16]  6th Hardy Decl. ¶¶ 36, 42, 94-111.  The FBI has described, plausibly

and in considerable detail, the harms one might reasonably expect to flow from the public

disclosure of such information, including: subjecting these individuals to unsolicited scrutiny and

harassment from the media, the general public, and current and former investigatory targets;

endangering the safety of individuals who have provided information in the course of an

investigation; and impairing the effectiveness of investigative activities by compromising the

identities of law enforcement personnel and deterring individuals from providing information in

the future.  *Id.*  The FBI credibly asserts that it reviewed each item of information withheld, and

concluded in each instance that the implicated privacy interests outweighed the public interest in

shedding light on the FBI's performance of its responsibilities.  *Id.* ¶¶ 96-97.  Meanwhile, the

FBI did not withhold identifying information where it was able to determine that the individual

was deceased or was a high-ranking governmental official whose activities may be of a greater

public interest.  *Id.*  These representations suffice to establish "a reasonable likelihood" that the

disclosure of such information would result in an unwarranted invasion of personal privacy.

Indeed, courts have repeatedly upheld identical withholdings.  *See, e.g.*, *Roth v. U.S. Dep't of

Justice*, 656 F. Supp. 2d 153, 161-62 (D.D.C. 2009); *Amuso v. U.S. Dep't of Justice*, 600 F.

---

[16]   The FBI has a practice of asserting Exemptions 6 and 7(C) together, as both turn on the unwarranted invasion of personal privacy, and has followed that practice in this case by invoking both exemptions to all six of these categories.  6th Hardy Decl. ¶¶ 36, 95 n.42.  The standards of review attaching to the two exemptions, though overlapping, are not identical: significantly, "due to the sensitive nature of law enforcement records and the greater privacy interest in such records," an agency's burden under Exemption 7(C) is less onerous than its corresponding burden under Exemption 6.  *Voinche*, 412 F. Supp. 2d at 68.  In this case, because the Court concludes that the FBI's withholding decisions are justified under the standard imposed under Exemption 7(C), it need not reach the question of whether the FBI's withholdings are independently justified under Exemption 6.

Supp. 2d 78, 94-97 (D.D.C. 2009); *Voinche*, 412 F. Supp. 2d at 68-69.

Schoenman's counter-arguments do not warrant a different conclusion and merit little attention here. First, Schoenman's assertion that some small subset of these individuals are his "friends and associates" and "would not be concerned with any privacy intrusion," Schoenman Decl. ¶ 25, is unsupported by competent evidence and ignores the fact that agencies are permitted to make categorical determinations when making withholding decisions under this exemption. *Reporters Comm.*, 489 U.S. at 780. Second, Schoenman's contention that the passage of time undercuts the privacy interests asserted, Pl.'s 2d Mem. at 30, is counter to the well-established principle that the "privacy interests of the persons mentioned in [] investigatory files do not necessarily diminish with the passage of time," *Branch*, 658 F. Supp. at 209, and even "[a]n individual's death diminishes, but does not eliminate, her privacy interest in the nondisclosure of any information about her that appears in law enforcement records," *Clemente*, 2010 WL 3832047, at *16. What is required of an agency is that it make "reasonable efforts to ascertain life status" before withholding information under this exemption, *Davis v. Dep't of Justice*, 460 F.3d 92, 98 (D.C. Cir. 2006), *cert. denied*, 551 U.S. 1144 (2007), and the record is clear that the FBI has made such reasonable efforts in this case. 6th Hardy Decl. ¶ 97. Third, and finally, despite Schoenman's assertion that the disclosure of third-party identifying information would further a public interest "in learning the details of illegal FBI surveillance activities," Pl.'s Mem. at 42, it cannot credibly be disputed that the release of information specifically identifying third parties within the six categories at issue, when the substantive contents of the records have otherwise been disclosed, would shed relatively little light on the performance and activities of the FBI. *See U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495-96 (1994)

(proponent of disclosure must show that the public interest advanced by disclosure is significant and is likely to advance the public's understanding of the operations of government).  As other courts have observed, "the public interest in the disclosure of this information is minimal," *Voinche*, 412 F. Supp. 2d at 68, and it does not, in any event, override the implicated privacy interests asserted in this case.  Furthermore, where as here, the public interest asserted is to show that responsible officials acted improperly in the performance of their duties, the proponent of disclosure must adduce "evidence that would warrant a belief by a reasonable person that the alleged [] impropriety might have occurred," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004), and Schoenman has failed to present anything remotely approaching this quantum of evidence here.  In sum, Schoenman has provided no basis for doubting the FBI's determination that the disclosure of the information withheld under this exemption "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

### iii.    The FBI has properly invoked Exemption (7)(D).

Exemption 7(D) allows agencies to withhold information in law enforcement records where the public disclosure of such information "could reasonably be expected to disclose the identity of a confidential source."  5 U.S.C. § 552(b)(7)(D).  To properly invoke this exemption, an agency must show either that the source provided information to the agency under an express assurance of confidentiality or that the circumstances support an inference of confidentiality. *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 179-81 (1993).  In this case, the FBI has withheld information provided under express assurances of confidentiality.  6th Hardy Decl. ¶ 114.  Specifically, the FBI has asserted Exemption 7(D) as a basis for not disclosing the

following: confidential source identifiers;[17] information provided by or that would identify confidential sources; and the identity of and information provided by foreign governments. *Id.* ¶¶ 36, 42, 115, 117, 119, 121, 124. In spite of Schoenman's attempts to cloud the issue by posing a litany of immaterial questions, Pl.'s Mem. at 46-48; Pl.'s 2d Mem. at 32-35, the FBI credibly explains, in a reasonably detailed and non-conclusory manner, that the information at issue in each instance was received in connection with an express grant of confidentiality and describes how the public disclosure of such information would have a chilling effect on the cooperation of other sources and thereby hinder its ability to gather confidential information. *Id.* ¶¶ 113-24. Indeed, courts have upheld identical withholdings in the past. *See, e.g.*, *Skinner v. U.S. Dep't of Justice*, __ F. Supp. 2d __, 2010 WL 3832602, at *23-24 (D.D.C. Sept. 30, 2010); *Holt v. U.S. Dep't of Justice*, __ F. Supp. 2d __, 2010 WL 3386016, at *14 (D.D.C. Aug. 26, 2010); *Blackwell v. Fed. Bureau of Investigation*, 680 F. Supp. 2d 79, 95 (D.D.C. 2010); *Amuso*, 600 F. Supp. 2d at 98-99. Based upon its careful review of the FBI's *Vaughn* index and sworn declarations, the Court finds that the FBI has properly invoked Exemption 7(D) in this case.

Before concluding, one final observation is in order. On October 18, 2010, long after the parties had finished briefing their respective cross-motions for summary judgment and without first seeking the Court's leave, Schoenman sought to supplement the record with an article from *The Commercial Appeal*, a newspaper published in Memphis, Tennessee. Pl.'s 3d Mem. The article is about Ernest C. Withers ("Withers"), a civil-rights era photographer, and his alleged role as an informant for the FBI. *See* Marc Perrusquia, *Double Exposure*, The Commercial

---

[17] As explained elsewhere, *see supra* Part III.C.2, the FBI also appropriately withheld confidential source identifiers pursuant to Exemption 2.

Appeal (Memphis), Sept. 12, 2010, at V1.  At one point, the article describes efforts to obtain

government records about Withers through FOIA requests.[18]  According to the article, in the

course of redacting and releasing records, the FBI "overlooked a single reference to Withers'

informant number."  *Id.*  With this "Rosetta Stone" in hand, the article continues, the author was

able to "unlock[] the secret" of Withers' alleged role as an FBI informant.  *Id.*  With minimal

explication, Schoenman contends that the article is relevant in this action for two reasons: first,

because it suggests that the FBI does not "universally withhold" source symbol numbers assigned

to confidential sources; and second, because it evidences that there is a "deep public interest" in

such information.  Pl.'s 3d Mem. at 1-2.  These arguments are, in addition to being untimely,

without merit.

    To the extent Schoenman relies upon the article as evidence that the FBI did in fact

neglect to withhold a confidential source identifier on a single occasion, his reliance is misplaced

for at least two reasons.  First, in this regard, as the article is offered for the truth of the matters

asserted therein and is therefore hearsay, it is not competent evidence.  *See Kimberlin v. Quinlan*,

6 F.3d 789, 797 n.15 (D.C. Cir. 1983) (providing that hearsay in newspaper articles "cannot

defeat a summary judgment motion"), *vacated on other grounds*, 515 U.S. 321 (1995); *Hartford

Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. 08 Civ. 3096 (TFH), 2007 WL

1876392, at *14 (D.D.C. June 28, 2007) (finding that opponent of summary judgment could not

rely on inadmissible hearsay in newspaper articles).  Second, the article—which describes

---

[18]  The author of the article and *The Commercial Appeal* subsequently commenced suit in
this District seeking the disclosure of documents concerning Withers' alleged role as an FBI
informant, an action which remains pending.  *See Memphis Publ. Co. v. Fed. Bureau of
Investigation*, No. 10 Civ. 1878 (RMU) (D.D.C.).

nothing more than an inadvertent failure to redact a single confidential source identifier out of a total of 369 pages of records—hardly undermines the proposition that confidential source identifiers are "vigorously protected" by the FBI (indeed, the basic thrust of the article is that the FBI aggressively guarded against the public disclosure of information). 7th Hardy Decl. ¶ 6. In other words, the article provides no reason to doubt the FBI's assertion that it has a consistent policy of withholding confidential source identifiers. *Id.*

To the extent Schoenman offers the article as evidence of an alleged "public interest" in the disclosure of confidential source identifiers, his reliance is again misplaced for at least two reasons. First, Schoenman simply reads too much into the article, which, at best, suggests that there may be a "public interest" in Withers and his alleged role as an FBI informant. The article does not evince a broader interest in the FBI's use of confidential source identifiers as a general matter. Second, in withholding confidential source identifiers in this action, the FBI relies upon Exemption 7(D), and "[u]nlike with other FOIA exemptions, [the district court] should 'not . . . balance interests under Exemption 7(D).'" *Farrugia v. Executive Office for U.S. Attorneys*, No. 04 Civ. 294 (PLF), 2006 WL 335771, at *7 (D.D.C. Feb. 14, 2006) (quoting *Parker v. Dep't of Justice*, 934 F.2d 375, 380 (D.C. Cir. 1991)); *see also Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 390 (D.C. Cir.) ("[T]his court has rejected a balancing of interests under Exemption 7(D)."), *cert. denied*, 552 U.S. 1007 (2007). Accordingly, even if it had not been untimely, Schoenman's argument is without merit.

> **D.** **The FBI Has Discharged its Burden of Establishing that it Has Disclosed All Reasonably Segregable Portions of the Responsive Records**

Even where an agency may properly withhold a responsive record under one of FOIA's enumerated exemptions, it nevertheless must disclose any non-exempt information that is

"reasonably segregable" from the responsive record. 5 U.S.C. § 552(b). The question of segregability is by necessity subjective and context-specific, turning upon the nature of the document in question and the information contained therein. *Mead Data*, 566 F.2d at 261. An agency need not, for instance, "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Id.* at 269 n.54. Ultimately, to discharge its burden before the district court, the agency "must provide a reasonably detailed justification rather than conclusory statements to support its claim that the non-exempt material in a document is not reasonably segregable." *Id.*

In the instant case, the FBI's sworn declarations describe how, after conducting multiple rounds of review of the records responsive to Schoenman's various requests, it has carefully reviewed and released all reasonably segregable information from those records. 6th Hardy Decl. ¶¶ 34, 47 n.26, 125. Moreover, the FBI identifies with specificity those records for which additional segregable information was released following upon the heels of its final round of review, *id.* ¶ 36 n.6 & n.7 and, where appropriate, explains why certain documents have been withheld in full. *Id.* ¶¶ 36, 42, 55, 57, 59, 66, 69, 74, 77. Based upon these descriptions as well as a searching review of the records that the FBI has withheld only in part, the Court concludes that the FBI has adequately demonstrated, in reasonable and non-conclusory terms, that all non-exempt material has either been disclosed to Schoenman or is not reasonably segregable.

**E.    *Schoenman Is Precluded from Relitigating the Reasonableness of the FBI's Search for Records***

Nearly two years ago, based on Schoenman's failure to respond to the FBI's arguments or to otherwise dispute the reasonableness of the FBI's search for records, this Court granted

summary judgment in the FBI's favor on that issue. *Schoenman*, 604 F. Supp. 2d at 204.

Schoenman now seeks to resurrect and relitigate the issue, contending that (a) summary judgment was "improvidently granted," and (b) the FBI's inability to locate various sample documents undercuts the reasonableness of the FBI's search for records.[19]  Pl.'s Mem. at 12-18; Pl.'s 2d Mem. at 18-20.  For various reasons, these arguments are without merit.

First, Schoenman, who is represented by counsel in this action, has never filed a formal motion for relief from this Court's prior order granting the FBI summary judgment on the issue of the reasonableness of its search.  *See* Fed. R. Civ. P. 60(b).  Instead, he merely suggests, in passing and in reply papers to which the FBI had no opportunity to respond, that summary judgment on this issue "was improper and should be vacated."  Pl.'s 2d Mem. at 20.  As the Court issued its prior order granting the FBI summary judgment on this issue on March 31, 2009—over one year and ten months ago—even if Schoenman were hypothetically to file a proper Rule 60(b) motion today, it would be untimely.  *See* Fed. R. Civ. P. 60(c)(1) ("A motion under Rule 60(b) must be made within a reasonable time—and for reasons [of newly discovered evidence[20]] . . . no more than a year after the entry of the judgment or order.").  Indeed, even if

---

[19]  While not entirely clear, Schoenman at one point also appears to suggest that this Court, in its prior order, decided something less than the reasonableness of the full scope of the FBI's search for records.  Pl.'s 2d Mem. at 18-20.  Even the most cursory reading of the FBI's moving papers and this Court's order would reveal that not to be the case.  *See Schoenman*, 604 F. Supp. 2d at 204; Def.'s Mem. of P. & A. in Supp. of the Mot. for Summ. J. on Behalf of Def. Federal Bureau of Investigation, Docket No. [73], at 11-13.

[20]  A motion pursuant to Rule 60(b) must be based on one of six enumerated basis.  *See* Fed. R. Civ. P. 60(b)(1)-(6).  Of these, only one even arguably has some salience here—"newly discovered evidence"—which must be raised within one year of the issuance of the challenged order or judgment.  Fed. R. Civ. P. 60(c)(1).  However, even assuming, *arguendo*, that a basis for relief that is not subject to the one-year, *per se* time bar were to apply, the Court would nevertheless conclude that Schoenman failed to raise the motion "within a reasonable time."  *Id.*

the Court were inclined to construe Schoenman's passing comment in the summary judgment papers that he filed on April 21, 2010 as a valid motion for relief (it is not so inclined), those papers were filed more than a year after the issuance of this Court's prior order and therefore the request would still be untimely.[21] *See id.*

Second, Schoenman's arguments regarding the reasonableness of the FBI's search for records concern a total of ten documents that the FBI was "unable to locate." Pl.'s Mem. at 12. Schoenman maintains that "the FBI is required to account for all such records and its efforts to search for and locate them." Pl.'s Mem. at 13. Even assuming, *arguendo*, that Schoenman could somehow resurrect the issue of the reasonableness of the FBI's search for records, the FBI does, in fact, adequately account for these ten records. 6th Hardy Decl. ¶¶ 25-29. Indeed, Schoenman concedes that the FBI's sworn declarations "recite[] efforts . . . the FBI has made to try and find these records." Pl.'s Mem. at 14. Four documents were placeholders for documents containing highly sensitive information that were removed and placed in a secure room known as the Special File Room. 6th Hardy Decl. ¶ 25. In an attempt to locate these documents, the FBI conducted three successive searches: it searched the Special File Room with no success; it

---

[21] True, Schoenman raised various factual issues purportedly going to the reasonableness of the FBI's search for records in his opening papers—which were filed on March 3, 2010, a shade over eleven months after the Court's prior order granting summary judgment in the FBI's favor as to the reasonableness of its search. Pl.'s Mem. at 12-18. However, apparently having completely forgotten about this Court's prior order, at no point in those papers did Schoenman acknowledge that the Court had already granted summary judgment in the FBI's favor, let alone suggest that the Court's prior order should be vacated. *Id.* In any event, even assuming, *arguendo*, that the memorandum could somehow be construed as a valid Rule 60(b) motion, while the one-year, *per se* time bar might not apply, the Court would nevertheless conclude that the motion was not made "within a reasonable time." Fed. R. Civ. P. 60(c)(1). By that point in time, Schoenman already had the reprocessed documents at issue in his possession for approximately eight months. 6th Hardy Decl. ¶¶ 5-13.

searched the office where many of the documents originated with no success; and it searched an off-site archival records facility with no success. *Id.* ¶ 26. Two more documents were envelopes apparently at one time containing documents pertaining to Schoenman; the FBI conducted a search within its Los Angeles Field Office and the file and corresponding sub-file were reviewed with no success. *Id.* ¶ 28. A seventh document originated with another agency; after internal efforts to locate the document were unsuccessful, the FBI contacted the relevant agency but the agency was unable to locate the document. *Id.* ¶ 27. An eighth document was a placeholder referencing another file where the relevant documents were presumably placed at one time; the FBI searched the referenced file with no success. *Id.* ¶ 29. A ninth document was an administrative cover page for which there was no underlying document. *Id.* ¶ 30. A tenth document was a so-called "charge out" sheet for documents forwarded to the National Archives and Records Administration, which were ultimately determined to be non-responsive to Schoenman's Requests. *Id.* ¶ 33.

Simply put, these efforts evince, at a bare minimum, that the FBI made a good faith, informed, and reasonable effort to locate the identified records. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Indeed, the record suggests that the FBI made an exceedingly thorough effort to account for and locate each individual document. *See Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982) (agency need not document "an epic search for the requested records"). More to the point, however, Schoenman's arguments are premised upon a misunderstanding as to the applicable legal standard. Because "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search," *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir.

2003), "the [mere] fact that a particular document was not found does not demonstrate the inadequacy of a search," *Boyd*, 475 F.3d at 391. Due to the age of the documents at issue here, it is entirely unremarkable that some documents would be missing or misplaced after years of movement and use. 6th Hardy Decl. ¶ 25. Over the years, "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." *Iturralde*, 315 F.3d at 315. Schoenman's speculation that certain documents simply must exist or may be located elsewhere simply does not suffice to raise "substantial doubt" as to the reasonableness of the FBI's search for records. *Id.* at 314.

For the foregoing reasons, Schoenman's attempt to relitigate the reasonableness of the FBI's search for records is without legal or factual merit.

### F. Schoenman is Not Entitled to Discovery

As he has on multiple occasions in this action, Schoenman again requests that discovery be had to address the reasonableness of the FBI's search for, and processing of, records responsive to his requests. For at least two reasons, Schoenman is not entitled to such discovery. First, summary judgment has already been granted in the FBI's favor as to the reasonableness of its search, *see supra* Part III.E, and there is simply no basis for conducting discovery on an issue already decided by the Court. Second, where, as here, the agency's declarations are sufficiently detailed and the district court is satisfied that no factual dispute remains, discovery should be denied. *Wolf v. Cent. Intelligence Agency*, 569 F. Supp. 2d 1, 9-10 (D.D.C. 2008). For each of these reasons, the Court shall once again DENY Schoenman's [143] Motion for Discovery.

## IV.  CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit.  Therefore, and for the reasons set forth above, the Court shall GRANT the FBI's [135] Renewed Motion for Summary Judgment and DENY Schoenman's [143] Renewed Cross-Motion for Summary Judgment.  In addition, the Court shall DENY Schoenman's [143] Motion for Discovery.  Finally, because there are no viable claims remaining against the FBI in this action, the Court shall DISMISS the FBI as a defendant.  An appropriate Order accompanies this Memorandum Opinion.


Date:   February 9, 2011


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge